796 P.2d 853

STATE of Arizona, Appellee,

v.

Fred Lawrence ROBINSON, and
Theodore Washington,
Appellants.

Nos. CR–88–0002–AP, CR–88–0003–AP.

Supreme Court of Arizona.

June 26, 1990.

Robert K. Corbin, Atty. Gen. by Barbara A. Jarrett, Phoenix, for appellee.

Roberson & Shelley by Robert J. Roberson, Yuma, for appellant Robinson.

Robert C. Clarke, Yuma, for appellant Washington.

## OPINION

ROLL, Court of Appeals Judge.

Fred Lawrence Robinson and Theodore Washington, along with co-defendant Jimmy Lee Mathers, were convicted of first-degree murder, attempted first-degree murder, two counts of aggravated assault, first-degree burglary, and armed robbery. All three defendants received death sentences for the murder and various terms of imprisonment for the remaining offenses.[1] This opinion addresses the appeals of Robinson and Washington. This court has jurisdiction pursuant to Ariz. Const. art. 6, § 5(3), and A.R.S. §§ 13–4031, 13–4033, and 13–4035. For the reasons set forth below, we affirm the respective convictions and sentences.

## FACTS

Fred Robinson met Susan Hill in 1972 through a motorcycle club. Eventually Susan became Robinson's common-law wife. The couple parented three children, Andre, Truman, and Misha. They had lived together in a stormy relationship punctuated by periodic separations. Robinson verbally and physically abused Susan.

In February 1984, Susan left Robinson to go and live with her sister in Pacoima, California. Robinson confronted Susan in Pacoima and eventually forced her to return with him to his Banning, California residence. He told Susan that if she did not return with him, he would take her out to the desert and dispose of her where no one would ever find her.

In June 1986, Susan was staying with another sister in North Hollywood, California. Two men forced their way into the house and tied Susan's sister's and niece's hands together, all the while exhibiting small handguns. Susan hid in a closet. Soon she heard Robinson talking and then heard her sister ask her to come out. When Susan stepped from the closet, Robinson began to unbuckle a knife from his belt. Susan begged him not to take out the knife. Robinson told Susan that he had travelled to North Hollywood intending to kill her and her sister but had changed his mind because of the niece's presence. Susan then returned to Banning with Robinson.

In November 1986, without Robinson's knowledge, Susan went to Philadelphia, Pennsylvania, to live with her aunt and uncle. When Susan mailed her children Christmas presents with a Philadelphia return address, Robinson discovered her whereabouts. In January 1987, Robinson went to Philadelphia to retrieve Susan. Jimmy Lee Mathers accompanied him on the trip. Robinson used a ruse to lure Susan to a train station. He then grabbed her and took her to California. Before Susan left Philadelphia, she told her aunt and uncle that something would happen to them if Susan did not return to Banning with Robinson.

Upon returning to California, Susan stayed with Robinson for approximately three weeks. In February 1987, Susan per-

---

1. In addition to the death sentence for murder (count one), all three defendants were sentenced to aggravated sentences of 21 years' imprisonment for attempted murder (count two), 15 years' imprisonment for both aggravated assaults (counts three and four), 15 years' imprisonment for first-degree burglary (count five), and 21 years' imprisonment for armed robbery (count six). The sentence on count two was ordered to run consecutively to the sentence in count one and concurrently with the sentences for counts three and four. Counts five and six were ordered to run concurrently with each other but consecutively to the sentence for count two.

suaded Robinson to permit her to go to her father's house in Yuma, Arizona, for one week. Her father, Ralph Hill, Sr., and stepmother, Sterleen Hill, lived in Yuma with their teenage son, LeSean. The Hills were well acquainted with Robinson. Susan lived at the Hill home nearly three weeks, during which time Robinson telephoned at least twice. Sterleen Hill told Susan to inform Robinson that Sterleen had obtained a peace bond against him and that Robinson should not enter upon their property. In a letter, Susan informed Robinson of her stepmother's statement.

Susan then went to Pacoima, California, to stay with her grandmother, then to Pasadena, California, to live with a sister. She did not notify Robinson that she had moved out of the Hills' home.

On June 8, 1987, in Banning, Robinson's son Andre was present when Robinson, Mathers, and Theodore Washington discussed going to Yuma. Washington was wearing a red bandana. Mathers told Andre that the trio was "going to Arizona to take care of some business." Robinson and Mathers put two handguns and a shotgun in Robinson's car. Robinson told Andre that he was going to Arizona to see if Susan was there. Robinson and Mathers left the residence travelling toward Washington's house. Washington, Robinson, and Mathers were last seen around 6:00 p.m. embarking on their trip in Robinson's tan Chevette.

Banning, California is approximately 175 miles from Yuma. Sometime around 11:30 p.m. that evening, Sterleen Hill heard sounds outside the Hills' Yuma home. She told LeSean to investigate but he saw no one. About 11:45 p.m., someone knocked on the door. When LeSean opened the door, a man with a deep voice identified himself as James and told LeSean that he had some money for Ralph Hill. When LeSean opened the door to accept the money, the man attempted to grab LeSean. LeSean pulled away, ran through the house past his parents' bedroom, and escaped through another door. Ralph and Sterleen Hill emerged from the bedroom as a result of the commotion and heard voices shout,

"We're narcotics agents. We want the dope and the money." Ralph Hill could see shadows of two people but could not identify their voices. The two intruders forced Ralph and Sterleen to return to the bedroom and lie face down on the floor. Someone kept saying, "We know you got the money and the dope." During this time a black man with a red bandana and a moustache "screwed" a handgun into Ralph's ear, then ransacked the drawers and closet. A second person stood over Ralph and Sterleen. Someone said, "We better get the kid." Ralph's and Sterleen's hands were tied behind their backs and their feet were bound. After Sterleen requested that her feet be covered up, Ralph was rendered unconscious.

While events unfolded in the Hill home, LeSean telephoned the police from a neighbor's house. As LeSean and the neighbor were returning to the Hills' home, they observed a tan Chevette speeding away from the vicinity, pursued by a sheriff's deputy in a marked police vehicle. This deputy was responding to LeSean's phone call. Before arriving at the Hills' home, however, the deputy observed the tan Chevette, travelling without its headlights on, in the vicinity of the Hills' home. When the officer turned on his emergency equipment and told the driver to stop, the driver smiled at the officer and fled. The officer gave chase and eventually stopped the fleeing vehicle. Robinson was driving the Chevette. An empty shotgun shell box, a red bandana, clothing and sheets, and Mathers' duffle bag were inside the vehicle.

Ultimately, law enforcement officers entered the Hills' home and found that Ralph and Sterleen Hill had been shot at close range with a .12-gauge shotgun. Ralph Hill survived, although he suffered massive injuries, including the loss of an eye. Sterleen Hill died as a result of loss of blood from the shotgun wound. The officers searched the neighborhood and discovered assorted .38-caliber cartridges in some bushes and a trench coat with the name Eric Robinson on a piece of paper in the pocket. A neighbor of the Hills found a loaded cylinder to a .38-caliber handgun in her mailbox. A sterling silver lighter case

and a watch were also found in the neighborhood. These items had been taken from the Hills'-home, as was a small locked box containing a gold watch and some coins. A shotgun was found in some weeds close to a gas valve line. A criminalist determined that spent shotgun shells found at or near the murder scene had been fired by the shotgun found near the gas valve line. Andre Robinson identified this shotgun as one owned by his father, and Truman Robinson identified it as the shotgun his father wrapped in a pink and white sheet and placed in the tan Chevette on June 8, 1987.

At approximately 2:00 a.m. on June 9, 1987, Washington placed a telephone call to his girlfriend, Barbara Bryant. He gave her a Yuma telephone number at which he could be reached. Later, Washington called a second time and gave her a second Yuma telephone number. Bryant phoned Washington a total of three times at Yuma telephone numbers. During one of these conversations, Washington told her that he was stranded in Arizona. One phone number at which Bryant contacted Washington was assigned to the Yuma bus station. Washington returned to Banning by bus.

Susan Hill was notified of the shootings and travelled from Pasadena to Yuma with four sisters, a brother, and a brother-in-law. While en route, she picked up her children in Banning. On the trip to Yuma, they travelled through Coachella, California, where they observed Mathers walking toward Banning. Andre told Susan that Mathers had been with Robinson when Robinson left Banning the day before. The family members confronted Mathers, who stated that he was coming from Arizona and that Robinson was in Yuma. When the group told Mathers that they were going to make a citizens' arrest, Mathers fled into a nearby grocery store. The police were notified and took him into custody.

## PROCEDURAL HISTORY

Robinson, Mathers, and Washington were indicted for first-degree murder, at-tempted first-degree murder, two counts of aggravated assault, first-degree burglary, and armed robbery. The matter was tried to a jury, and all three were found guilty on all counts. Following an aggravation-mitigation hearing, the trial judge sentenced all three to death.

## ISSUES ON APPEAL

On appeal, Robinson and Washington argue that error occurred when (1) prior bad act evidence was admitted, (2) hearsay evidence regarding the murder weapon was admitted, and (3) the state was permitted to introduce hearsay evidence from a law enforcement officer to impeach the testimony of a friend of Washington, and (4) the trial court erroneously restricted the cross-examination of Barbara Bryant. Both Robinson and Washington argue that their death sentences should be vacated because (1) the killing was not committed for pecuniary gain, (2) the killing was neither depraved nor heinous, nor was it cruel, and (3) a further hearing was required regarding the presence of *Tison*[2] and *Enmund*[3] considerations. We also consider whether the death sentences imposed in this case are proportional to those imposed in similar cases.

### Evidentiary Rulings

A. Prior Bad Act Evidence

■ Robinson and Washington argue that the trial court erred in admitting evidence of Robinson's trips to Philadelphia and North Hollywood in order to locate Susan and compel her return to Banning. Our standard of review for the admission or exclusion of evidence is abuse of discretion. *Throop v. F.E. Young and Co.*, 94 Ariz. 146, 155, 382 P.2d 560, 566 (1963); *State v. Stanley*, 156 Ariz. 492, 494, 753 P.2d 182, 184 (App.1988).

■ Rule 404(b) permits introduction of prior bad acts as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Ariz.R.Evid. 404(b), 17A A.R.S. Prior bad

---

2. *Tison v. Arizona*, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987).

3. *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982).

act evidence need not necessarily constitute evidence of a particular crime. *State v. Jeffers*, 135 Ariz. 404, 419, 661 P.2d 1105, 1120, *cert. denied*, 464 U.S. 865, 104 S.Ct. 199, 78 L.Ed.2d 174 (1983).

The North Hollywood incident was admissible to prove Robinson's modus operandi and to prove that Robinson sent Washington to the Hill home as part of a scheme to retrieve Susan. It is true that Washington was not with Robinson when he dispatched two individuals to Susan's North Hollywood residence. However, since the evidence was clearly admissible against Robinson, the absence of Washington diminishes the prejudicial impact of the North Hollywood episode as to him.

The Philadelphia incident was also admissible to prove Robinson's modus operandi. *State v. Harding*, 141 Ariz. 492, 498, 687 P.2d 1247, 1252 (1984). Robinson's trip to Philadelphia occurred only five months before the assault on the Hills' home. This trip was similar to the North Hollywood incident inasmuch as it involved Robinson going to extraordinary lengths to compel Susan to return to him. Finally, both trips were admissible against Robinson as motive evidence. In this regard, they both demonstrate Robinson's obsession with Susan coupled with a proclivity to go to extraordinary lengths to possess her. *Jeffers*, 135 Ariz. at 419, 661 P.2d at 1120.

As an alternative to complete exclusion of this evidence, Washington suggests that his trial should have been severed from that of Robinson, thereby permitting the state to introduce the Philadelphia and North Hollywood evidence against Robinson. However, we note that the trial court gave a limiting instruction when this evidence was presented. This adequately protected Washington. *State v. Canedo*, 125 Ariz. 197, 200, 608 P.2d 774, 777 (1980).

We find no error on this ground.

**B. Police Report Evidence**

■ Defendants argue that the trial court erred in admitting hearsay evidence that the shotgun used in the slaying had been reported missing. The state asserts that it introduced this evidence in order to place the shotgun in Banning.

■ Over defense objection, the state had a law enforcement officer relate the contents of the report on the missing shotgun, that is, that on January 20, 1987, a Banning resident reported that his .12–gauge pump shotgun, Savage Model No. 69RXL, Serial No. E437931, was missing. The trial court permitted this evidence to be introduced because it was a routine report, made prior to the crime, and did not implicate the defendants. Our standard of review regarding admission of this evidence is abuse of discretion. *Throop, supra; Stanley, supra.*

The state argues this report was admissible under Rule 803(8)(B), Ariz.R.Evid., 17A A.R.S. Defendants correctly note, however, that the language of Rule 803(8)(B) excludes criminal cases where matters are observed by police officers and other law enforcement personnel. Nevertheless, the testimony was admissible because it was not offered to prove the truth of the report, but to establish the geographical location of the shotgun as being Banning, California. Moreover, the significance of this hearsay evidence, placing the shotgun in Banning five months before it was used to shoot Sterleen and Ralph Hill, was vastly diminished by other evidence directly linking Robinson and Washington to the shotgun.

■ Defendants also argue that evidence of the disappearance of the shotgun tended to point to one or both of the defendants as thieves or receivers of stolen property. Realistically, any prejudice against the defendants arising from this evidence was minimal in view of the egregious conduct with which the defendants were charged. Any error was harmless beyond a reasonable doubt. *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674, 686 (1986).

*Cross–Examination of Barbara Bryant*

■ Robinson and Washington argue that the trial court erred in limiting cross-examination of Washington's girlfriend, Barbara Bryant. The scope of cross-exami-

nation is committed to the sound discretion of the trial court. *State v. Smith,* 138 Ariz. 79, 81, 673 P.2d 17, 19 (1983), *cert. denied,* 465 U.S. 1074, 104 S.Ct. 1429, 79 L.Ed.2d 753 (1984).

During direct examination, Bryant testified that she received telephone calls from Washington in the early morning hours of June 9, 1987, that she returned Washington's telephone calls, and that during one such conversation, Washington stated that he was stranded in Arizona.

During cross-examination, Washington's attorney attempted to elicit from Bryant the remainder of her conversation with Washington, but the trial court sustained the prosecutor's objections on hearsay grounds. When the trial court requested an offer of proof as to the evidence sought to be elicited, Robinson's attorney stated that Bryant had previously told a law enforcement officer that Washington had not asked her to come pick him up. This statement, argues Robinson, was inconsistent with her trial testimony that Washington said he was stranded. Robinson did elicit from Bryant that Washington frequently became stranded after partying with other motorcycle club members. Ultimately, the trial court restricted Washington's questions of Bryant on the ground that the probative value of the proffered evidence was outweighed by its prejudicial impact and, in any event, Bryant's trial testimony was not inconsistent with her prior statements.

■ The trial court did not abuse its discretion. Assuming arguendo that the prosecutor presented inadmissible hearsay against Robinson by eliciting from Bryant that Washington, during one of his telephone calls, said that he was stranded in Arizona, Robinson has failed to demonstrate prejudice. Bryant's brief summary of what Washington said to her made no reference to Robinson, and was admissible against Washington. Bryant's telephone billing reflects long-distance calls to Yuma consistent with the times Bryant said she spoke with Washington. Washington's offer of proof set forth no specific exculpatory information that he hoped to elicit. In addition, Bryant did testify that it was not unusual for Washington to become stranded during innocuous activities. Any error was harmless beyond a reasonable doubt. *Van Arsdall, supra.*

### Impeachment of Joseph Dixon

■ Washington and Robinson argue that the trial court erred when it permitted the prosecutor to impeach Joseph Dixon with prior allegedly inconsistent statements. The standard of review for the trial court's ruling is abuse of discretion. *State v. Woods,* 141 Ariz. 446, 454, 687 P.2d 1201, 1208 (1984).

■ During the investigation, Dixon told law enforcement officers that on June 8, 1987, he saw Washington, Robinson, and Mathers together, and Washington was wearing a bandana. At trial, Dixon testified that he could not recall whether it was Mathers and Robinson that he saw together or Mathers and Washington. He also testified that he did not recall who had been wearing the bandana. The trial court permitted the prosecutor to question the witness regarding his prior statements and to call the law enforcement officer to whom Dixon made the earlier statements. Defendants argue that since Dixon only stated that he could no longer recall rather than denying that he made the statements, the statements were not inconsistent and impeachment should not have been permitted.

We disagree. Extrinsic evidence of Dixon's prior statements was introduced only after Dixon was given the opportunity to explain or deny the prior statements. Accordingly, impeachment with the extrinsic evidence was permissible. Rule 613(b), Ariz.R.Evid., 17A A.R.S. Impeachment of Dixon by the state was permissible even though Dixon was called as a witness by the state. Rule 607, Ariz.R.Evid., 17A A.R.S.; *State v. Sustaita,* 119 Ariz. 583, 587, 583 P.2d 239, 243 (1978). That Dixon claimed failure of memory rather than outright denying having made the earlier statements did not preclude impeachment. *United States v. Rogers,* 549 F.2d 490, 496 (8th Cir.1976), *cert. denied,* 431 U.S. 918, 97 S.Ct. 2182, 53 L.Ed.2d 229 (1977). In

*Rogers*, the Eighth Circuit stated: "The trial judge should have considerable discretion to determine whether evasive answers are inconsistent with positive assertions of an extrajudicial nature previously given." *Id.* Dixon testified that he and the three defendants were good friends; that he, Robinson, and Mathers were members of a motorcycle club and Washington was a prospective member; that he had known Robinson for 14–15 years; and that he had lived with Robinson for four to five months. The trial judge stated that he did not know whether the witness was being evasive or was merely typical of many people with poor recollection.

The trial court did not abuse its discretion when it permitted the state to impeach Dixon with extrinsic evidence.

### Death Sentences

■ The trial court determined that two aggravating circumstances applied to both Robinson and Washington. These factors are that the offense was committed in consideration for or in the expectation of anything of pecuniary value and the offense was committed in an especially heinous, cruel, or depraved manner. A.R.S. § 13–703(F)(5) and (6). The court also found that as to Robinson, the commission of the offense was procured by the payment or promise of payment of anything of pecuniary value. A.R.S. § 13–703(F)(4).

We must independently review the existence of aggravating and mitigating circumstances to determine if the death penalty was properly imposed. *State v. Walton*, 159 Ariz. 571, 586, 769 P.2d 1017, 1032, *cert. granted*, 493 U.S. ——, 110 S.Ct. 49, 107 L.Ed.2d 18 (1989); *State v. Beaty*, 158 Ariz. 232, 242, 762 P.2d 519, 529 (1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 3200, 105 L.Ed.2d 708 (1989).

### A. Aggravating Circumstances

■ The state must prove the existence of aggravating circumstances beyond a reasonable doubt. A.R.S. § 13–703(C); *Walton, supra.*

### 1. *Promise of Payment*

■ The trial court found as an aggravating circumstance against Robinson that Robinson "procured the commission of the offense by payment, or promise of payment, of anything of pecuniary value." A.R.S. § 13–703(F)(4).

During the aggravation-mitigation hearing, the state presented evidence of a post-arrest statement made by Washington to Major Ralph Ogden of the Yuma County Sheriff's Office. Washington said that Robinson planned the June 8, 1987 trip to the Hills' home, and Robinson told him that the Hill residence belonged to a cocaine trafficker. Robinson disclosed a plan to "take off" the cocaine dealer who lived at the house and to steal any cocaine and/or money present. Robinson said that "if things get rough, shoot 'em.'" Washington told the officer that Robinson did not announce this plan until Robinson, Washington, and Mathers arrived in Yuma. Washington's post-arrest statement was apparently considered by the trial court as evidence that Robinson had procured the slaying by promising Washington a pecuniary benefit.

■ An aggravation-mitigation hearing regarding the death sentence involves the same safeguards as a trial. A.R.S. § 13–703(C). That provision states in part:

[T]he admissibility of information relevant to any of the aggravating circumstances ... shall be governed by the rules governing the admission of evidence at criminal trials.

These rules of evidence include the right of an accused to confront adverse witnesses as guaranteed by the sixth amendment. Also, as a matter of right, post-arrest statements by non-testifying co-defendants may not be considered against the accused. *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

■ In *Walton v. State*, 481 So.2d 1197 (Fla.1985), the Florida Supreme Court vacated a defendant's death sentence and remanded for further proceedings because the primary evidence introduced against Walton during the penalty phase of his

trial consisted of post-arrest statements of his co-defendants. The fact that in Arizona the penalty phase is tried to a judge rather than to a jury does not cause statements otherwise in violation of the sixth amendment to become admissible.

We are therefore obligated to search the record in order to ascertain whether sufficient evidence exists apart from Washington's post-arrest statement to support the trial court's finding that Robinson procured the murder by the promise of anything of pecuniary value. Robinson provided the murder weapon and transported Washington to the home of his common-law wife's parents. There is no evidence that Washington knew the Hills or where they lived but for the guidance of Robinson. Once at the Hill home, Washington demanded drugs and/or money from the Hills. Even disregarding Washington's post-arrest statement implicating Robinson, the evidence supports the trial court's finding that Robinson procured the slaying through promises to Washington of pecuniary gain, that is, the presence in the Hill home of drugs and/or money.

2. *Commission for Anything of Pecuniary Value*

■ The trial court found as an aggravating circumstance against Robinson and Washington that the offense was committed in the expectation of receiving something of pecuniary value. A.R.S. § 13–703(F)(5).

Prior to the slaying, the assailants demanded drugs and money from the Hills. Washington searched closets and drawers for valuables. A few items were stolen from the house, although most were later discovered abandoned in the neighborhood. Accordingly, the trial court's finding that Washington had a financial motive for participating in the murder is supported by the evidence. *State v. Gretzler*, 135 Ariz. 42, 49, 659 P.2d 1, 8, *cert. denied*, 461 U.S. 971, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983).

■ While Washington was motivated by greed, Robinson, on the other hand, suggests that any participation on his behalf was simply motivated by revenge, cou-

pled with a desire to locate Susan. Nothing in the record even remotely suggests that the Hills were drug traffickers or that Robinson believed that they were. As between Robinson and Washington, only Robinson knew the Hills and their true status.

■ In *State v. Correll*, 148 Ariz. 468, 479, 715 P.2d 721, 732 (1986), this court held that to establish this factor, the evidence must show that the hope of financial gain supplied the impetus for the murder. *See also State v. Gillies (Gillies I)*, 135 Ariz. 500, 512, 662 P.2d 1007, 1019 (1983). There is no evidence that Robinson was motivated by the expectation of pecuniary gain. The trial court's finding on this factor as to Robinson is therefore set aside. However, the elimination of one aggravating factor does not mandate a remand to the trial court for resentencing when the record compels a finding on the issue as a matter of law. *Clemons v. Mississippi*, — U.S. —, —, 110 S.Ct. 1441, 1448, 108 L.Ed.2d 725, 737 (1990); *State v. Emery*, 141 Ariz. 549, 553, 688 P.2d 175, 179 (1984).

3. *Heinous, cruel, or depraved*

■ The trial court also found as an aggravating circumstance that the murder was committed in an especially heinous, cruel, or depraved manner. A.R.S. § 13–703(F)(6). Any one of these circumstances—heinous, cruel, or depraved—can constitute an aggravating circumstance. *State v. Libberton*, 141 Ariz. 132, 139, 685 P.2d 1284, 1291 (1984); *State v. Clark*, 126 Ariz. 428, 436, 616 P.2d 888, 896, *cert. denied*, 449 U.S. 1067, 101 S.Ct. 796, 66 L.Ed.2d 612 (1980).

■ The terms "heinous" and "depraved" focus on the killer's state of mind and attitude at the time of the offense. *State v. Wallace*, 160 Ariz. 424, 773 P.2d 983 (1989); *Gretzler*, 135 Ariz. at 51, 659 P.2d at 12. Five factors can support a finding of a mental attitude which was heinous and depraved: (1) the apparent relishing of the murder by the killer, (2) the infliction of gratuitous violence on the victim beyond the murder itself, (3) needless

mutilation, (4) senselessness of the crime, and (5) helplessness of the victim. *Wallace*, 160 Ariz. at 427, 773 P.2d at 986; *Gretzler*, 135 Ariz. at 51–52, 659 P.2d at 10–11.

As difficult as it may be to define depravity, the gangland-style action of forcing two elderly persons to lay face down on the floor, tying them up, then senselessly shooting them amounts to depraved· conduct. See *State v. Roscoe*, 145 Ariz. 212, 226, 700 P.2d 1312, 1326, *cert. denied*, 471 U.S. 1094, 105 S.Ct. 2169, 85 L.Ed.2d 525 (1985).

 Cruelty focuses upon the victim's pain and suffering. *Wallace, supra; Gretzler, supra*. Psychological pain may be the equivalent of the most severe physical torture. *Correll*, 148 Ariz. at 480, 715 P.2d at 733, *quoting State v. (Ricky Wayne) Tison*, 129 Ariz. 526, 543, 633 P.2d 335, 352 (1981), *cert. denied*, 459 U.S. 882, 103 S.Ct. 180, 74 L.Ed.2d 147 (1982). The evidence indicated that Sterleen Hill was startled by the sudden intrusion of two armed individuals in her home. She and her husband were bound and forced to lie face down on their bedroom floor while demands were made upon them to produce drugs and money. Being bound would have caused Sterleen great distress. *Correll*, 148 Ariz. at 480, 715 P.2d at 733. The court could infer that Sterleen was uncertain as to her ultimate fate. *State v. McCall*, 139 Ariz. 147, 161, 677 P.2d 920, 934 (1983), *cert. denied*, 467 U.S. 1220, 104 S.Ct. 2670, 81 L.Ed.2d 375 (1984). Because there was no evidence that she was rendered unconscious by a physical blow prior to being executed, she, like Ralph Hill, probably heard one of the intruders state that they should "get" the Hills' teenage son. Ralph Hill testified that he was then suddenly rendered unconscious. The evidence supports the inference that his loss of consciousness resulted from being shot in the back with a .12–gauge shotgun. Sterleen Hill would have witnessed this. Being aware that Ralph had been shot, and undoubtedly realizing that she was next, supports a finding of mental suffering by Sterleen. *Correll*, 148 Ariz. at 480, 715

P.2d at 733; *McCall*, 139 Ariz. at 161, 677 P.2d at 934. Although the shots were fired in close proximity in time, because the shotgun was a pump shotgun, at least a short period of time must have elapsed between the time that Ralph Hill was wounded and Sterleen Hill was executed.

The record amply supports the trial court's conclusion that the murder was committed in an especially heinous, cruel, or depraved manner.

## B. Mitigating Circumstances

 In death penalty cases, this court is obligated to review the record to determine whether any mitigating circumstances outweigh aggravating circumstances. *State v. Stevens*, 158 Ariz. 595, 598, 764 P.2d 724, 727 (1988); *State v. Richmond (Richmond I)*, 114 Ariz. 186, 196, 560 P.2d 41, 51 (1976), *cert. denied*, 433 U.S. 915, 97 S.Ct. 2988, 53 L.Ed.2d 1101 (1977).

 Robinson offered no mitigating circumstances and we agree with the trial court that none exist.

 Washington argues the presence of four mitigating circumstances. He contends that his intoxication, his minor role, his youthfulness, and his familial activities prior to the homicide all constitute mitigating circumstances.

 Intoxication can be a mitigating circumstance. A.R.S. § 13–703(G)(1); *State v. Gillies (Gillies II)*, 142 Ariz. 564, 571, 691 P.2d 655, 662 (1984), *cert. denied*, 470 U.S. 1059, 105 S.Ct. 1775, 84 L.Ed.2d 834 (1985). However, evidence of Washington's intoxication was sparse. There was no showing that his consumption of alcohol impaired him to any degree.

Washington maintains that his participation was minor. However, the state, during the aggravation-mitigation hearing, produced evidence of Washington's post-arrest statement. Washington said he was advised by Robinson prior to going to the Hills' home that the mission was to steal cocaine and money from a drug trafficker and that it might be necessary to kill the residents if difficulty was encountered. Evidence at trial showed that Washington

carried a .38–caliber handgun into the Hills' home, helped ransack their home, and did nothing to prevent the killing of Sterleen and the shooting of Ralph. Washington was not a minor participant.

Washington argues that his youthfulness is a mitigating factor. On June 8, 1987, Washington was 27 years old. We have refused to find age as a mitigating circumstance in cases where the defendant was much younger than Washington. *See, e.g., State v. Walton,* 159 Ariz. 571, 589, 769 P.2d 1017, 1035, *cert. granted,* 493 U.S. ——, 110 S.Ct. 49, 107 L.Ed.2d 18 (1989) (age 20 not a mitigating factor); *State v. Gerlaugh,* 144 Ariz. 449, 460, 698 P.2d 694, 705 (1985) (age 19 not a mitigating factor); *State v. Clabourne,* 142 Ariz. 335, 348, 690 P.2d 54, 67 (1984) (age 20 not a mitigating factor); *State v. Gillies (Gillies I),* 135 Ariz. 500, 513, 662 P.2d 1007, 1020 (1983) (age 20 not a mitigating factor). *But see State v. Valencia,* 132 Ariz. 248, 250, 645 P.2d 239, 241 (1982) (age 16 sufficiently young to establish mitigating factor). We agree with the trial court that Washington's age was not a mitigating factor.

Finally, Washington argues that prior to the slaying he was a single parent raising a young son. However, viewed in the overall context of this case, this is not such a mitigating circumstance as to require the vacating of the death sentence imposed against him.

We agree with the trial court's determination that no mitigating circumstances exist so as to warrant vacating either Robinson's or Washington's death sentences.

C. Enmund/Tison Hearing

■■■ Robinson and Washington argue that *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), and *Tison v. Arizona,* 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987), preclude imposition of the death sentence. In *Enmund,* the Supreme Court held that the eighth amendment is violated if the death penalty is imposed for murder based upon an aider and abetter theory unless the defendant killed, attempted to kill, or intended to kill the victim. 458 U.S. at 797, 102 S.Ct. at

3376, 73 L.Ed.2d at 1151. The Supreme Court held that because Enmund was a minor actor in an armed robbery, was not on the scene when the killing occurred, never intended to kill, and had no culpable mental state, the death sentence was unwarranted. However, when a defendant's participation in a felony is major and is combined with reckless indifference to human life, the *Enmund* culpability requirement is satisfied. *Tison,* 481 U.S. at 158, 107 S.Ct. at 1688, 95 L.Ed.2d at 145.

Evidence exists in this case that Robinson loaded firearms into his vehicle in preparation for the trip from Banning to Yuma, that Washington was at least present when the hands and feet of Ralph and Sterleen Hill were bound, that the Hills were terrorized with firearms, that Robinson masterminded the trip, and that Washington was at least present in the Hills' home when Ralph Hill was wounded and Sterleen Hill was murdered. The requisite culpability was met as to both Robinson and Washington.

■■■ Robinson and Washington argue that a separate *Enmund/Tison* evidentiary hearing was required in order to determine the extent of the respective defendant's personal culpability for the slaying. We disagree. Previously, when this court has remanded matters to the trial court for such hearings, the principles articulated under *Enmund/Tison* were not in effect at the time that the aggravation-mitigation hearings were conducted, and therefore *Enmund/Tison* principles were not considered by the sentencing courts. *See, e.g., State v. Tison,* 160 Ariz. 501, 502, 774 P.2d 805, 806 (1989). In the matter before us, the trial court expressly addressed the *Enmund/Tison* factors. No separate hearing was required. In this case, the trial court found two ·aggravating circumstances applied to Washington, and that three applied to Robinson. Based upon our independent review of the aggravating circumstances, we have concluded that two aggravating circumstances apply to Washington and Robinson. These two aggravating circumstances are sufficient to warrant imposition of the death penalty.

### D. Proportionality Review

Finally, we must conduct a proportionality review to determine whether "the sentences of death are excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." *State v. Walton*, 159 Ariz. 571, 589, 769 P.2d 1017, 1035, *cert. granted*, 493 U.S. ——, 110 S.Ct. 49, 107 L.Ed.2d 18 (1989); *State v. Richmond (Richmond I)*, 114 Ariz. 186, 196, 560 P.2d 41, 51 (1976), *cert. denied*, 433 U.S. 915, 97 S.Ct. 2988, 53 L.Ed.2d 1101 (1977).

In our proportionality review, we have considered cases involving the aggravating circumstances found in this case and cases where the trial court found no mitigating circumstances sufficiently substantial to require leniency. *See, e.g., State v. Walton, supra* (no mitigating circumstances shown; death penalty affirmed upon findings that killing was done for pecuniary gain and in a heinous, cruel, or depraved manner); *State v. Martinez–Villareal*, 145 Ariz. 441, 702 P.2d 670, *cert. denied*, 474 U.S. 975, 106 S.Ct. 339, 88 L.Ed.2d 324 (1985) (no mitigating circumstances found; death penalty affirmed upon findings that killings were done for pecuniary gain and in a depraved manner); *State v. McCall, supra* (no mitigating circumstances found; death penalty affirmed upon findings that killings were done for pecuniary gain and in a heinous, cruel, or depraved manner); *State v. Gillies (Gillies I), supra* (despite defendant's youth, death penalty affirmed upon finding that the killing was done in a cruel manner); *State v. Ceja*, 126 Ariz. 35, 612 P.2d 491 (1980) (no mitigating circumstances shown; death penalty affirmed upon finding that killings were done in a heinous and depraved manner).

We also have considered cases in which the death penalty was reduced to life imprisonment. *See, e.g., State v. Stevens*, 158 Ariz. 595, 764 P.2d 724 (1988) (findings of defendant's diminished capacity to appreciate the wrongfulness of his conduct, lack of prior convictions, and non-aggressive nature outweighed finding that the killing was done for pecuniary gain); *State v. Johnson*, 147 Ariz. 395, 710 P.2d 1050 (1985) (death penalty improper where aggravating circumstances erroneously found); *State v. Valencia*, 132 Ariz. 248, 645 P.2d 239 (1982) (youthfulness of defendant was substantial mitigating factor); *State v. Madsen*, 125 Ariz. 346, 609 P.2d 1046, *cert. denied*, 449 U.S. 873, 101 S.Ct. 213, 66 L.Ed.2d 93 (1980) (death penalty reduced to life imprisonment where killing not done in a depraved manner or for pecuniary gain).

Based upon our review of these decisions, we find that the imposition of the death penalty in the present case is proportional to the sentences imposed in similar cases.

### FUNDAMENTAL ERROR

We have searched the record for fundamental error as required by A.R.S. § 13–4035, *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), and *State v. Leon*, 104 Ariz. 297, 451 P.2d 878 (1969). Other than that mentioned, we find no error.

The judgments of conviction and sentences are affirmed.

MOELLER, CORCORAN and FELDMAN, JJ., and EINO M. JACOBSON, Judge, Court of Appeals, concur.

GORDON, C.J., and CAMERON, J., did not participate in this decision; pursuant to Ariz. const. art. 6, § 3, EINO M. JACOBSON, Judge, Court of Appeals, Division One, and JOHN M. ROLL, Judge, Court of Appeals, Division Two, were designated to sit in their stead.