883 P.2d 1024

**STATE of Arizona, Appellee,**

v.

**Eric John KING, Appellant.**

**No. CR–91–0084–AP.**

Supreme Court of Arizona,
En Banc.

Nov. 3, 1994.

Grant Woods, Atty. Gen. by Paul J. McMurdie, Chief Counsel, Crim. Appeals Section, Daniel J. Kiley, John Pressley Todd, Asst. Attys. Gen., Phoenix, for appellee.

Dean W. Trebesch, Maricopa County Public Defender by Edward F. McGee, Deputy Public Defender, Phoenix, for appellant.

## OPINION

CORCORAN, Justice.

John Eric King (defendant) was convicted of two counts of premeditated first-degree murder and sentenced to death on both counts. This automatic appeal followed. *See* A.R.S. § 13–4031; rules 26.15, 31.2(b) and 31.15(a)(3), Arizona Rules of Criminal Procedure. We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3), and A.R.S. §§ 13–4031 to –4033, and we affirm defendant's convictions and sentences.

### I. FACTS AND PROCEDURAL HISTORY

Shortly after midnight on December 27, 1989, a black male, brandishing a pistol, robbed the Short Stop convenience market at 48th Street and Broadway in Phoenix. During the course of the robbery, both the store clerk and security guard were shot and killed. The robbery was captured on two time-lapse video cameras. The videotape was admitted into evidence and showed the robber pointing the gun at the clerk and that clerk moving backward and then falling to the floor as the robber left the store. Photographs developed from the videotape depict a black male wearing a dark sweater with a band of light colored, diamond-shaped markings across the chest and arms. No one else was present in the store at the time of the robbery.

At approximately midnight on December 27, Frank Madden drove to the Country Kitchen restaurant parking lot, which is behind the Short Stop on the north side, where he was to meet his date. As he drove past the Short Stop toward the restaurant, he saw two black men walking in the parking lot. The men were a little over 6 feet tall and one of them wore a blue or black and white sweater with "some kind of pattern like pyramids"; the other man wore a "green sweatshirt."

Madden and his girlfriend discovered that the restaurant was closed. As they were talking, they heard gunshots and immediately drove over to the Short Stop. When Madden got out of his car and walked toward the front of the store, he saw the security

guard, with an empty gun holster, lying on the ground. At the same time, the black man with the dark sweater, who Madden had seen earlier at the Country Kitchen parking lot, was also walking toward the store.

Madden heard the guard moaning and saw blood on the right side of his stomach. He phoned 911. While Madden was on the phone, the man with the dark sweater went over to the security guard, pulled out a white cloth, and wiped the guard's holster and belt. After Madden saw him, the man in the dark sweater left the scene. Madden could not positively identify defendant as the man he saw that night, but he testified that the man he saw had "high cheekbones" like defendant's, that defendant looked very familiar, and the only difference was that the man he saw had facial hair and was not as nicely dressed as defendant.

Around midnight, Kevin Harris and his friend David Dils were driving through the intersection of 48th Street and Broadway when they too heard gunshots. Harris was looking in the direction of the Short Stop and saw two black men running away from the store; one of the men held a gun in his hand. Harris and Dils drove into a nearby parking lot, got out of the car, and approached the store. Harris saw the security guard lying on the ground and a man using the phone. Dils checked the guard's pulse and found none. They then entered the store and saw the clerk behind the counter; he had been shot in the right shoulder and stomach and was holding a telephone yelling into the receiver. Dils and Harris assisted the clerk until the fire department arrived.

Shortly after the shootings, Nolan Thomas, his son Derek, and Greg Hecky pulled into the Short Stop. Just as Nolan parked his car, Derek directed his dad's attention to the security guard lying on the ground. Nolan looked over and saw a black man with a mustache and goatee, wearing a black sweater with a white "logo," bending over the security guard. Like Madden, he saw the man wipe off the guard's empty holster with a white rag and then run off.

About that time, Phoenix Police Sergeant Richard Switzer received a radio call to go to the Short Stop. The call included a description of the suspects. While driving east on Broadway, he saw two black males walking west on Broadway across 44th Place. Sgt. Switzer made a U-turn and drove toward the men to determine whether they fit the suspects' descriptions. Sgt. Switzer shined a spotlight on the two men, got out of his car, and walked toward them. Despite Sgt. Switzer's order to "halt," one of the men, wearing a blue sweater with white markings on the upper sleeve, fled the scene running south. The man who stopped identified himself as Michael Jones. After being asked about the man who ran away, Jones told Sgt. Switzer that he had just met the man and did not know him. At trial, Sgt. Switzer testified that he remembered the man he saw with Jones that night as being slightly taller than Jones, who was 6 feet 1 inches tall.

Later that night, Nekita Renee Hill and her friend Joann Smith walked to Smith's house. Ms. Smith lived in the area of 48th Street and Broadway, and her house was within walking distance of the Short Stop. During their walk, they noticed helicopters flying overhead.

As they approached Smith's house, Hill saw defendant walking toward a dumpster. She saw him throw a light-colored, thin plastic bag in the dumpster. The bag contained a gun and a dark sweater with a white diamond pattern that Hill had seen defendant wearing earlier that night.

Hill knew defendant, who was a childhood friend of her boyfriend Jones; defendant had frequently visited Jones at Smith's house while Hill was there. Sometime later, Hill saw a picture on television that she recognized as defendant. When she saw defendant's picture, she called the police.

Both defendant and Jones were arrested later in connection with the robbery and murders.[1] Jones, who had been to the Short Stop a couple of times the evening of the murders, admitted at trial that he was at the Short Stop when the robbery and murders occurred. He testified that he and defendant

1. Jones was later released and no charges were filed against him.

had gone to the Short Stop to buy wine and that he had remained outside while defendant went inside the store. Jones said that while he was waiting outside, he heard gunshots. On hearing the shots, he turned toward the store and saw defendant leaving the store with a gun in his hand and the security guard lying on the ground in front of the store.

Jones testified that earlier in the evening he had seen the security guard with a large gun in his holster, a gun that was either a .44 or a .357 magnum. Although he said that he had not seen defendant touch the guard, he testified, without objection, that he believed defendant got the gun from the security guard.

At trial, Jones testified that the next time that he saw defendant—several days after the murder when they both had been arrested—defendant's hair was shorter and he had shaved his beard and mustache. He further testified that defendant at trial looked like he did when he was arrested. After viewing one of the photographs made from the surveillance camera tapes, Jones testified that the person depicted in the photograph "looks a lot like" defendant and that "it seems like" defendant.

At trial, Hill was a reluctant witness, admitting that she did not want to be involved with the trial and that she was testifying only under threat of arrest. Hill testified that defendant and Jones had gone to the Short Stop in the "middle of the night" on the night of the murders and that she had wanted to go with them but her mom would not babysit for her. When shown a copy of the picture that was broadcast over the television, she admitted that the picture prompted her call to the police. She also admitted telling the police that the person depicted in the picture was defendant. She tried recanting her earlier identification, however, by testifying that the person depicted in the picture did not look like defendant. Hill did testify that defendant had a beard and a mustache, and that his hair was longer and wilder looking at the time of the murders.

Defendant did not testify at trial, and the only witness who he called was Sgt. Switzer, who essentially restated his earlier testimony concerning the height of the man who ran away when he stopped Jones. Defendant argued that the state failed to meet its burden of proof by attacking the credibility of the state's two key witnesses (Jones and Hill) and by focusing the court's attention on his height of 5 feet 8 inches as compared to testimony of two witnesses that the person with Jones was over 6 feet tall. The jury unanimously convicted defendant of two counts of premeditated first-degree murder and one count of armed robbery, dangerous.

Defendant did not speak on his own behalf at the sentencing hearing. In fact, defendant left in the middle of the hearing, telling the judge that he did not want to be there because:

> I thought I had a right to be proven not guilty. Like I said I did not commit the crime. No evidence, no effect. You already heard the case. I know the situation. You will give me the death penalty or life. I feel either way you go and I want to leave.

He was sentenced to death for each of the two first-degree murder convictions and to.a consecutive, aggravated term of 21 years on the armed robbery conviction. Defendant was also ordered to pay restitution of $72.84.

In its special verdict, the court found that the state had proved, beyond a reasonable doubt, 3 aggravating circumstances under A.R.S. § 13-703(F): that (1) defendant committed the murders in expectation of pecuniary gain, (2) defendant committed the murders in an especially depraved manner, and (3) defendant committed multiple murders during the commission of the offense. The court considered this last aggravating circumstance, defined by A.R.S. § 13-703(F)(8), as supporting the death sentence on either Count I or Count II.

In mitigation, the court found that defendant had not proved any of the statutory mitigating circumstances enumerated in A.R.S. § 13-703(G) by a preponderance of the evidence. He found, however, that defendant had proved 6 non-statutory mitigating circumstances: (1) he had a traumatic childhood, (2) his family was dysfunctional, (3) he suffers from post-traumatic distress,

(4) he has a substance abuse problem, (5) he has an antisocial personality disorder produced in part by his dysfunctional childhood,[2] and (6) he has a family that loves him. The court determined that none of these mitigating circumstances, taken individually or collectively, warranted leniency.

## II. ISSUES

We address the following issues in this appeal:

### Trial Issues

1. Did the trial court err in permitting the prosecution to impeach Michael Page Jones on points where he claimed only failed recollection?

2. Did the prosecutor commit misconduct in his opening statement by vouching for his witnesses and declaring that Nekita [Renee] Hill feared for her safety?

3. Did the trial court abuse its discretion in reversing the ruling of the previous judge barring opinion evidence of identification of King by his acquaintances from videotapes?

### Sentencing Issues

4. Did the trial court err in refusing to find that King had proved diminished capacity as a mitigating factor when the court found all aspects of the underlying factual predicate for this factor to be true?

5. Did the trial court err in refusing to consider in mitigating evidence that King possessed potential for rehabilitation and presented a minimal risk for future dangerousness?

6. Did the trial court err in finding that witness elimination was evidence of especial depravity?

### Other Issues

In addition, defendant makes the following claims that do not warrant extended discussion, either because defendant's claims previ-

ously have been decided adversely to him in other cases or because defendant states no viable claim.

7. Did the trial court violate the dictates of *Lockett v. Ohio* by dividing its consideration of mitigating factors into statutory and non-statutory categories?

No. This argument is meritless. *Lockett* does not speak to how a court should organize its findings. *See generally Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). *Lockett* stands for the proposition that a sentencer in a death case must "not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." 438 U.S. at 604, 98 S.Ct. at 2964–65 (emphasis omitted).

8. Did the trial court violate double jeopardy by aggravating each of King's murder sentences with proof of multiple homicides?

No. *See State v. Greenway*, 170 Ariz. 155, 167–68, 823 P.2d 22, 34–35 (1991) (rejecting double jeopardy argument and finding aggravating factor applied to each of defendant's first degree murder convictions when both murders were committed during commission of offense); *see also State v. Ramirez*, 178 Ariz. 116, 131, 871 P.2d 237, 252 (1994) (same).

9. Is the death penalty proportional in this case?

*See State v. Salazar*, 173 Ariz. 399, 417, 844 P.2d 566, 584 (1992) (proportionality review not constitutionally required and court no longer conducts them).

10. Is death by lethal gas cruel and unusual punishment, barred by the 8th and 14th Amendments to the United States Constitution and article 2, § 15 of the Arizona Constitution?

No. *State v. Williams*, 166 Ariz. 132, 142, 800 P.2d 1240, 1250 (1987) (holding that execution by lethal gas is not cruel and

---

**2.** Although this factor was not included in the conclusion section of the special verdict, it is clear from the transcript of sentencing proceed-

ings that the trial court both found and considered this factor.

unusual punishment prohibited by either 8th and 14th amendments to United States Constitution or article 2, § 15 of the Arizona Constitution); *see also* Ariz. Const. art. 22, § 22 (approved by electors in November 3, 1992 general election, amending constitution and giving defendant option of lethal injection or lethal gas, thus mooting claim).

11. Was King denied his right, under the 14th amendment to the United States Constitution, to equal protection of the law when he was denied a jury trial on aggravating factors in a capital case while defendants in non-capital cases have juries to determine aggravating factors?

No. *See State v. Spencer*, 176 Ariz. 36, 45, 859 P.2d 146, 155 (1993) citing *State v. Landrigan*, 176 Ariz. 1, 6, 859 P.2d 111, 116 (1993) (equal protection not violated because jury determines aggravating factors in non-capital cases whereas judge makes determination in capital cases).

12. Does Arizona's death penalty statute violate the 8th amendment because it does not sufficiently channel the sentencer's discretion?

No. *See State v. Greenway*, 170 Ariz. 155, 164, 823 P.2d 22, 31 (1991) (finding that Arizona's death penalty statute narrows class of persons eligible for death penalty); *see generally Walton v. Arizona*, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990) (upholding Arizona's death penalty statute against various constitutional challenges).

13. Does Arizona's death penalty statute fail to adequately channel sentencing discretion because it fails to establish standards for balancing mitigation against aggravation?

No. *See State v. Fulminante*, 161 Ariz. 237, 258, 778 P.2d 602, 623 (1989) (rejecting this claim); *see also Zant v. Stephens*, 462 U.S. 862, 875 n. 13, 103 S.Ct. 2733, 2742 n. 13, 77 L.Ed.2d 235 (1983) (discussing *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), and *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), as standing for proposition that specific standards for bal-

ancing aggravating against mitigating circumstances not required).

## III. DISCUSSION

### TRIAL ISSUES

1. *Admissibility of Michael Page Jones's Statements to Police*

Michael Jones was the state's star witness against defendant. Before he testified, defense counsel attempted to get a ruling on the admissibility of Jones's statements made to Detective Armando Saldate when Saldate first questioned him. Because defense counsel anticipated that Jones would claim that he could not remember the events of that evening, she requested a ruling prohibiting the state from using Jones's earlier statements for impeachment. The state argued that the statements were admissible to impeach Jones if his memory loss was feigned, and, in the alternative, the state could lay the proper foundation to show that the statements were admissible as past recollection recorded. The trial court delayed its ruling until hearing Jones's testimony; afterward, the trial judge concluded, over defendant's hearsay objections, that Jones's statements to Saldate were admissible under rules 803(5), Arizona Rules of Evidence (past recollection recorded) and 801 (prior inconsistent statements).

Defendant argues that the trial court erred in admitting Saldate's testimony about Jones's earlier statements and, in doing so, violated defendant's right to confront his accusers, guaranteed to him by the Sixth Amendment to the United States Constitution and article 2, § 24, of the Arizona Constitution. The State counters by arguing that Saldate's testimony concerning Jones's earlier statements was admissible (1) as prior inconsistent statements under rule 801(d)(1); (2) as Jones's past recollection recorded under rule 803(5); or (3) under the residual hearsay exception, rule 804(b)(5). Alternatively, the state argues that any error in admitting Saldate's testimony concerning Jones' earlier statements was harmless.

### a. Evidentiary Ruling

■ Admissibility of evidence is within the discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. *State v. Williams*, 132 Ariz. 153, 157, 644 P.2d 889, 893 (1982) (citations omitted); *see also State v. Robinson*, 165 Ariz. 51, 58, 796 P.2d 853, 860 (1990) (applying abuse of discretion standard to trial court's ruling allowing state to use extrinsic evidence to impeach witness who claimed memory failure). ·

■ After concluding that Jones was "feigning his memory loss," the trial court ruled that Detective Saldate's testimony ·was admissible under rule 801(d)(1) as a prior inconsistent statement. Rule 801(d) provides in part:

> A statement is not hearsay if ... [t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with the declarant's testimony, ....

The only dispute concerning admissibility of Saldate's testimony under rule 801(d)(1) is whether Jones's earlier statements were inconsistent with his testimony at trial. Defendant argues that Jones's statements at trial—i.e., that he did not remember various events or conversations—were not inconsistent with his prior statements describing the event.

"A statement's inconsistency ... is not limited to cases in which diametrically opposite assertions have been made." *United States v. Rogers*, 549 F.2d 490, 496 (8th Cir. 1976). "A claimed inability to recall, when disbelieved by the trial judge, may be viewed as inconsistent with previous statements...." *Rogers*, 549 F.2d at 496; *see also State v. Lenarchick*, 74 Wis.2d 425, 247

N.W.2d 80, 87 (1976) (adopting similar rule); *People v. Green*, 3 Cal.3d 981, 92 Cal.Rptr. 494, 479 P.2d 998, 1002 (1971) (same).

This court recognized this rule in a case factually similar to defendant's case, *State v. Robinson*, 165 Ariz. 51, 796 P.2d 853 (1990). In *Robinson*, a state witness testified that he could not remember various details of a crime. 165 Ariz. at 58, 796 P.2d at 860. The trial court permitted the state to question the witness regarding prior statements that the witness made to law enforcement officers about "forgotten" details and then allowed the officers to testify about the witness's earlier statements. *Robinson*, 165 Ariz. at 58–59, 796 P.2d at 860–61. After discussing possible motives for the witness's memory loss, this court upheld the trial court's ruling and found that the trial court did not abuse its discretion in allowing the state to impeach its witness with extrinsic evidence. *Robinson*, 165 Ariz. at 59, 796 P.2d at 861.

The record in this case reflects that the trial judge concluded that Jones was "feigning his lack of memory." After reviewing the record, we conclude that the trial court did not abuse its discretion in reaching this conclusion.[3] Accordingly, we find that Jones's statements to Detective Saldate were admissible under rule 801(d)(1), Arizona Rules of Evidence.[4]

Despite having determined that this evidence was admissible under Arizona Rules of Evidence, our inquiry does not end here. We now turn to whether the admission of this evidence violated defendant's Sixth Amendment right to confrontation.

### b. Confrontation Clause

■ "The confrontation clauses of the state and federal constitutions guarantee criminal defendants the right to confront

---

**3.** The evidence in the record that supports the trial court's conclusion includes: (1) Jones testified that he did not want to be testifying; (2) while testifying, Jones would claim not to remember certain events, but when pushed, he would often "remember" what happened; and ■ Jones would often attribute his memory loss to his drinking the night of the murders, but Detective Saldate and the police officer who stopped Jones on the night of the murders both testified that Jones did not appear intoxicated.

**4.** Having concluded that Detective Saldate's testimony concerning Jones's earlier statements was admissible under rule 801(d)(1), we need not decide the state's claim that these statements also were admissible under rule 803(5), the past recollection recorded hearsay exception, or under rule 804(b)(5), the residual hearsay exception.

their accusers." *State v. Robinson*, 153 Ariz. 191, 203, 735 P.2d 801, 813 (1987); *see* Ariz. Const. art. 2, § 24; U.S. Const. amend. VI. This right "has long been read as securing an adequate opportunity to cross-examine adverse witnesses." *United States v. Owens*, 484 U.S. 554, 557, 108 S.Ct. 838, 841, 98 L.Ed.2d 951 (1988) (citations omitted); *see Robinson*, 153 Ariz. at 203 n. 15, 735 P.2d at 813 n. 15 (citations omitted). And, as the United States Supreme Court explained:

> The Confrontation Clause guarantees only "an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." [citations omitted].... It is sufficient that the defendant has the opportunity to bring out such matters as the witness' bias, his lack of care and attentiveness, his poor eyesight, and even (what is often a prime objective of cross-examination, ...) the very fact that he has a bad memory.

*Owens*, 484 U.S. at 559, 108 S.Ct. at 842 (emphasis supplied).

In this case, the hearsay declarant, Jones, testified at trial and was subjected to unrestricted cross-examination. And, the fact that Jones testified that he could no longer remember certain details of the crime, even assuming his claim were true, does not result in a violation of the confrontation clause. *Cf. Owens*, 484 U.S. at 557–60, 108 S.Ct. at 841–43 (allowing introduction of witness's earlier out-of-court identification of defendant despite fact that witness testified he could not remember any events surrounding attack). Defendant's opportunity to cross-examine Jones before a jury satisfies the requirements of the confrontation clause.[5] Thus, we find that the admission of Jones's out-of-court statements to Detective Saldate did not violate defendant's confrontation clause rights.

## 2. *Improper Vouching*

Defendant also argues that he was denied a fair trial because the prosecutor committed misconduct in his opening statement by vouching for his witnesses and declaring that Hill feared for her safety. We disagree and begin our discussion with defendant's claim of improper vouching.

■ The prosecutor made the following statements during his opening argument:

> You will hear from a man by the name of Michael Page Jones. Mr. Jones was with Eric King that night. In fact, at one time Mr. Jones was charged as an accomplice. The case was later dismissed. Michael Jones was with Mr. King. He told the police officers later in December exactly what happened. I can't guarantee you what Mr. Michael Page Jones is going to say when he gets on the stand, ladies and gentlemen, but he was there that night and he has information, and I suggest to you that if he testifies truthfully as he should, he will implicate the defendant, Eric King, without a doubt.

After the prosecutor completed his opening statement, defendant asked for a mistrial, claiming that the prosecutor vouched for the credibility of Michael Page Jones. The trial court denied the motion and stated that he did not "believe there was a clear vouching of the witness." Moreover, the trial judge noted that he had admonished the jury before opening statements that none of the statements were evidence and that he would be giving a similar admonition before closing arguments.

"The object of an opening statement is to apprise the jury of what the party expects to prove and prepare the jurors' minds for the evidence which is to be heard." *State v. Lee*, 110 Ariz. 357, 360, 519 P.2d 56, 59 (citation omitted). Yet, "[i]t is improper for the prosecution to vouch for the credibility of a government witness." *United States v. Roberts*, 618 F.2d 530, 533 (9th Cir.1980). There are "two forms of impermissible prosecutorial vouching: (1) where the prosecutor places the prestige of the government behind its witness; [and] (2) where the prosecutor suggests that information not presented to the

---

**5.** Having concluded that Detective Saldate's testimony was properly admitted under Arizona's Rules of Evidence and that the admission of this testimony did not violate the confrontation clause of either the United States' or Arizona's Constitution, we need not decide the state's claim that the admission of Saldate's testimony was harmless error.

jury supports the witness's testimony." *State v. Vincent,* 159 Ariz. 418, 423, 768 P.2d 150, 155 (1989). "The first type of vouching involves personal assurances of a witness's veracity...." *Roberts,* 618 F.2d at 533. "The second type of vouching involves prosecutorial remarks that bolster a witness's credibility by reference to matters outside the record." *Roberts,* 618 F.2d at 533.

With these statements, the prosecutor was voicing his expectation that Jones's testimony would be consistent with the earlier statements that he made to the police, and that he would implicate King. At the same time, however, the state was preparing the jury for the possibility that Jones might testify otherwise. We fail to see, nor does defendant explain, how, by suggesting that one of its own witnesses might lie on the stand, the state was vouching for the credibility of its witness. *Cf. Vincent,* 159 Ariz. at 423, 768 P.2d at 155 (finding improper vouching when prosecutor said state would not have put witness on stand if state did not believe every word from witness's mouth); *Roberts,* 618 F.2d at 533–34 (finding improper vouching of credibility of witness when prosecutor referred to evidence not in record by stating police officer was monitoring witness's testimony for truthfulness). Because we find that the state did not vouch for the credibility of its witness, we find no error.

Equally unpersuasive is defendant's claim that the prosecutor committed misconduct by declaring that Hill feared for her safety. During his opening argument, the prosecutor made the following statements:

> Who else? Renee Hill is here. Renee Hill at one time was the girlfriend of Michael Jones. Renee Hill currently lives in the Projects. She is on welfare, and she is scared to death. She comes to Court today not voluntarily, but because Detective House managed to go out and find her over the last 24 or 36 hours and bring her to the Court. She is scared. Whether she should be or whether she shouldn't be, ladies and gentlemen, it doesn't matter, because in her own mind she is scared. She does not want to testify. She does not want to come into this courtroom under any circumstances. Ladies and gentle-

men, she will be brought into this courtroom, and you will hear her testify.

Defendant argues that the clear implication of the statement that Renee Hill was afraid to testify was that "King or others acting for him had threatened her," and that the state's "reference to Hill's fear called the jury's attention to matters it would not have been justified in considering."

■ We begin by noting that defendant did not object to this statement until after Hill testified. This court has repeatedly held that the defendant must voice his objection to arguments that are objectionable, and failure to do so constitutes a waiver of any right to review. *State v. Holmes,* 110 Ariz. 494, 496, 520 P.2d 1118, 1120 (1974) (citation omitted); *see also State v. Taylor,* 109 Ariz. 267, 274, 508 P.2d 731, 738 (1973) (listing cases in which court refused to consider allegations of improper statements by prosecution when defendant failed to make timely objection). Thus we conclude that by failing to object to the prosecutor's comments in a timely fashion, defendant waived any objections that he may have had to these comments.

■ Defendant argues that even absent objection, the introduction of these statements was fundamental error because it prevented him from having a fair trial. We disagree.

Defendant moved for a mistrial after Hill's testimony and argued that the combination of her testimony and the prosecutor's opening statements concerning Hill's fear made it impossible for him to get a fair trial. The trial court denied the motion, stating:

> [Hill's] demeanor obviously indicated she did not want to be there. She was a very reluctant witness. It was obvious she was under a great deal of stress and anxiety and fear, and she never indicated that fear was coming from any specific individual or defendant or anybody from his family.

We have reviewed both the opening statements and Hill's testimony on direct examination, and we agree with the trial court's conclusions.

Moreover, far from being a matter that the jury is not justified in considering, Hill's unwillingness to testify goes directly to her

**278**

credibility. As with Jones, the prosecutor had no idea what Hill would say once she was on the stand. The prosecutor rightly anticipated that he would have to provide the jury some explanation for Hill's eventual refusal to identify defendant.

Hill testified that she called the police after seeing the surveillance pictures broadcast on television. She admitted that she identified defendant as the person in the picture. When asked whether defendant was the person depicted in the surveillance photograph, however, she repeatedly stated that the person in the picture did not look like defendant. Her fear and anxiety over testifying certainly served to bolster her earlier identifications over her trial testimony. Thus, we conclude that the state did not err either in eliciting testimony concerning Hill's reluctance to testify or in preparing the jury for the possibility that Hill was going to be a reluctant witness.

■ Although we conclude that the trial court did not commit fundamental error in this case, we caution lawyers against making overreaching factual assertions during opening statements. Opening statements are intended to inform the jury of what the party expects to prove and prepare the jury for the evidence that is to be presented. *State v. Prewitt*, 104 Ariz. 326, 333, 452 P.2d 500, 507 (1969). Opening statements are not, however, the appropriate forum to argue a case. *State v. Burruell*, 98 Ariz. 37, 40, 401 P.2d 733, 736 (1965).

In this case, the prosecutor wanted to prepare the jury for the fact that Hill might be a reluctant witness. To accomplish this, the state commented that Hill was "scared to death." The court can envision different factual circumstances where the use of this type of improper but colorful hyperbole during opening statements could have unduly prejudiced the defendant. Although we believe no such prejudice occurred in this case, we caution lawyers against straying too far from the purpose of the opening statements by "arguing" a case through its characterization of the evidence that it intends to offer at trial. This kind of reference is better left for closing arguments—where a prosecutor can properly refer to evidence actually in the

record. *Cf. State v. Cornell*, 179 Ariz. 314, 331, 878 P.2d 1352, 1369 (1994) ("prosecutor must not make prejudicial insinuations without being prepared to prove them").

### 3. *Lay Witness Opinion Testimony*

Defendant argues that the trial court abused its discretion in reversing an earlier ruling by the first trial judge in which the judge barred the introduction of opinion testimony by defendant's acquaintances identifying defendant as the person depicted in surveillance videotape pictures taken during the robbery and murders. Defendant essentially makes two claims in support of his argument.

He first argues that the first judge's ruling on the admissibility of this testimony became the law of the case, and that by allowing this testimony, the second judge violated both the law of the case doctrine and the restrictions imposed by rule 16.1(d), Arizona Rules of Criminal Procedure. We disagree.

■ We begin by noting that both the law of the case laws and rule 16.1(d) are procedural rules. *See Love v. Farmers Ins. Group*, 121 Ariz. 71, 73, 588 P.2d 364, 366 (App.1978), and rule 16.1(d). This court has previously explained law of the case as

a rule of general application that the decision of an appellate court in a case is the law of that case on the points presented throughout all the subsequent proceedings in the case in both the trial and the appellate courts, and no question necessarily involved and decided on that appeal will be considered on a second appeal or writ of error in the same case, provided the facts and issues are substantially the same as those on which the first decision rested, and, according to some authorities, provided the decision is on the merits.

*Monaghan's Estate*, 71 Ariz. 334, 336, 227 P.2d 227, 228 (1951) (citations omitted); *see also* 5 Am.Jur.2d *Appeal and Error* § 744 (1962); Annotation, *Erroneous Decision as Law of the Case on Subsequent Appellate Review*, 87 A.L.R.2d 271, 275 (1963). The term also has been used in "discussing the question whether a judge is bound to follow a prior decision made in the same case by

another judge in the same court." 5 Am. Jur.2d *Appeal and Error* § 744 (1962); *see* 1B James W. Moore, *Moore's Federal Practice* ¶¶ 0.401, 0.404 (2d ed. 1992).

The law of the case doctrine reflects the need for "an end to litigation and a final decision that parties can rely on." *Monaghan's Estate*, 71 Ariz. at 336, 227 P.2d at 228. Despite our general adherence to this doctrine, we have recognized it as a rule of procedure, not substance. *Love*, 121 Ariz. at 73, 588 P.2d at 366; *see also Dancing Sunshines Lounge v. Industrial Comm'n*, 149 Ariz. 480, 482, 720 P.2d 81, 83 (1986). "A court does not lack the power to change a ruling simply because it ruled on the question at an earlier stage." *Love*, 121 Ariz. at 73, 588 P.2d at 366.

At the trial court level, the doctrine of the law of the case is "merely a practice that protects the ability of the court to build to its final judgment by cumulative rulings, with reconsideration or review postponed until after the judgment is entered." 1B James W. Moore, *Moore's Federal Practice* ¶ 0.404[4.-1] (2d ed. 1992). "[T]his doctrine does not prevent a judge from reconsidering his or her previous nonfinal orders." *Plumb v. State*, 809 P.2d 734, 739 (Utah 1990). Nor does it prevent a different judge, sitting on the same case, from reconsidering the first judge's prior, nonfinal rulings. *See Broyles v. Fort Lyon Canal Co.*, 695 P.2d 1136, 1144 (Colo.1985); *Stepanov v. Gavrilovich*, 594 P.2d 30, 36 (Alaska 1979); *State v. Carden*, 170 Mont. 437, 555 P.2d 738, 740 (1976). In fact, the court's discretion to reconsider an earlier ruling is reflected in one of our procedural rules, which provides:

> Finality of Pretrial Determinations. Except for good cause, or as otherwise provided by these rules, an issue previously determined by the court shall not be reconsidered.

Rule 16.1(d), Arizona Rules of Criminal Procedure.

■ Although the power of a trial court to reconsider an earlier ruling under both rule 16.1(d) and the law of the case doctrine should not be used lightly, we review any such reconsideration for abuse of discretion.

■ Defendant moved to exclude testimony of his acquaintances identifying him in the videotape, arguing that their testimony constituted expert testimony under rule 702, Arizona Rules of Evidence, and that the witnesses were not experts within the meaning of rule 702. To support his motion, defendant cited various cases involving experts who testified concerning the accuracy of eyewitness identification. In response to defendant's motion in limine, the state argued that it did not intend to introduce "expert" testimony, but instead intended to have individuals who knew defendant identify him as the person depicted in the videotape. This was explained again during oral argument, at which time Judge Ryan's predecessor requested some authority supporting the admission of such testimony.

Judge Ryan's predecessor granted defendant's motion in limine without any explanation other than his statement that "there is something about [this evidence] that just rubs me the wrong way," and "I don't know what it is." Immediately after granting the motion, he stated that "[u]nless you can show me authority to the contrary, we got some new stuff coming down the pike ...," after which he proceeded to discuss the motion for change of venue. The minute entry for this hearing noted only that defendant's motion was granted for reasons stated on the record. Sometime after this motion was decided, the case was transferred to Judge Ryan's calendar.

The state, noting that the court left open the possibility of a rehearing on this motion, moved for a rehearing, arguing that this evidence was admissible under rule 701 and citing relevant case law. In his response opposing the rehearing, defendant did not challenge the state's claim that the trial court left this matter open; he merely argued that there was no good cause for the court to reconsider the earlier ruling, and thus rule 16.1(d) should preclude the court from entertaining this rehearing.

In considering the state's motion for rehearing, Judge Ryan reviewed defendant's motion in limine, the state's motion for reconsideration, and defendant's response to the motion. Based on these documents, Judge

Ryan concluded that defendant's motion in limine went only to the issue of the admissibility of identification testimony by expert witnesses under rule 702. Accordingly, Judge Ryan considered the admissibility of this evidence under rule 701 and concluded that the evidence was admissible.

Although Judge Ryan did not have the record when he reconsidered defendant's motion in limine, the record suggests that his predecessor left this question open for reconsideration. Moreover, we find that Judge Ryan reasonably concluded that the only issue previously decided concerning this evidence was its admissibility under rule 702. Defendant's motion and the state's response argued the admissibility of this evidence under rule 702, and the minute entry reflected only that defendant's motion was granted for the reasons stated on the record. Accordingly, we find that Judge Ryan did not abuse his discretion in reconsidering admissibility of testimony from defendant's acquaintances that the person depicted in the videotape was defendant.

We now address defendant's second claim in which he argues that the admission of this evidence essentially allowed the witnesses to testify as to the ultimate issue of defendant's guilt, which he argues is prohibited by this court's ruling in *Fuenning v. Superior Court*, 139 Ariz. 590, 680 P.2d 121 (1984). We disagree.

The testimony of defendant's acquaintances concerning the identity of the person depicted in the pictures from the videotape taken during the robbery were admissible under rule 701, Arizona Rules of Evidence. That rule permits non-expert witnesses to give their opinions if their opinions are rationally based on their perception and helpful to the determination of a fact in issue.

Although the jurors had the pictures before them and could make their own comparison between the person depicted in the pictures and defendant, they, unlike the state's witnesses, did not know defendant at the time the murders occurred. And, because defendant changed his appearance between the time of the crime and the trial, testimony from those who knew defendant at the time

of the crime is particularly relevant. Because the state's witnesses knew defendant at the time of the murders, their opinions that the person depicted in the picture was or was not defendant was based on their perceptions. Moreover, their opinions assisted the jury in determining a fact in issue— the identity of the person on the videotape. Thus, this evidence was admissible under rule 701. *See, e.g., United States v. Langford*, 802 F.2d 1176, 1178–79 (9th Cir.1986) (admitting similar testimony under rule 701); *United States v. Ingram*, 600 F.2d 260, 261–62 (10th Cir.1979) (same).

Despite defendant's claims to the contrary, admitting this evidence was not contrary to our decision in *Fuenning*, in which the defendant was charged with driving under the influence. In presenting its case, the prosecutor elicited a police officer's opinion whether defendant was driving under the influence. This court specifically stated that "opinion evidence is usually admissible, even though the opinion 'embraces an ultimate issue' of fact." 139 Ariz. at 605, 680 P.2d at 136, citing rule 704. We went on to say, however, that it was not "advisable to ask for a witness's opinion of whether the defendant committed the crime with which he was charged." 139 Ariz. at 605, 680 P.2d at 136; *see also* rule 704, Comment (opinion evidence not permitted on how jury should decide case).

The testimony in this case is a far cry from that of which we disapproved in *Fuenning*. The state did not ask the witnesses whether, in their opinion, defendant committed first-degree murder. Instead, the state tried to elicit through testimony from individuals who knew defendant at the time the picture was taken and who had seen him on the night of the murders, whether, in their opinion, the person depicted in the photograph was defendant. Although identification testimony embraces an issue of fact—the identity of the perpetrator, and perhaps evidence of guilt— the persons providing the identifications are not providing opinions of defendant's guilt or innocence or telling the jury how it should decide the case. Accordingly we find no

error in the admission of this testimony.[6]

## SENTENCING ISSUES

### 1. *Diminished Capacity*

In addition to his claims of trial error, defendant also raises various sentencing issues. Defendant's first argument is that the trial court erred in refusing to find that he had proved diminished capacity as a mitigating factor.

The trial court found that defendant proved various non-statutory mitigating factors [7] including:

1. Traumatic childhood
2. Dysfunctional family
3. Substance abuse problem
4. Post-traumatic distress
5. Antisocial personality disorder produced in part by defendant's dysfunctional childhood.[8]

Defendant claims that the 5 factors listed served as the predicate for his psychologist's opinion that defendant "suffered from post-traumatic stress disorder to an extent sufficient to impair his ability to conform his conduct to the requirements of the law." [9] Accordingly, defendant argues, the court's finding that defendant failed to prove diminished capacity under A.R.S. § 13–703(G)(1) was clearly erroneous.

■ A defendant may establish a mitigating circumstance under A.R.S. § 13–703(G)(1) by proving that:

> The defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution.

Moreover, a defendant must prove the existence of this mitigating circumstance by a preponderance of the evidence. *See* A.R.S. § 13–703(C); *State v. Atwood,* 171 Ariz. 576, 648, 832 P.2d 593, 665 (1992).

■ To prove that his capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, defendant offered the testimony of Mickey McMahon, Ph.D., along with a psychological report that Dr. McMahon prepared. After reviewing defendant's evidence, we agree with the trial court's conclusion that defendant failed to prove diminished capacity under § 13–703(G)(1).

In his conclusion to his psychological report, Dr. McMahon stated:

> [I]t would appear that the client was intoxicated to some degree at the time of the offense. Whether or not the crime would have occurred if the client had not been intoxicated is open to conjecture; however, intoxication has traditionally been thought of as impairing an individual's ability to appreciate the wrongfulness of their conduct or to conform it to the requirements of the law. In my opinion, intoxication was a primary ingredient that interfered with the client's ability to appreciate the full consequences of his behavior at the moment the offense occurred.

By stating that intoxication was "a *primary* ingredient that interfered with [defendant's] ability to appreciate the full consequences of his behavior," Dr. McMahon makes clear that defendant's capacity to appreciate the full consequences of his behavior was not significantly impaired by other factors.

Although Dr. McMahon concluded that defendant was intoxicated to some degree at the time of the offense, the only support he provided for this conclusion was defendant's statements. When asked what defendant

---

6. Because we conclude that the trial court did not abuse its discretion in reconsidering its earlier ruling on admissibility of testimony from defendant's acquaintances concerning the identity of the person depicted in the photographs and because we also conclude that the admission of this evidence did not result in witnesses providing their opinions of defendant's guilt or innocence, we do not decide the state's harmless error claim.

7. As noted earlier, the court found that defendant proved 6 non-statutory mitigating circumstances; however, only 5 of the 6 factors relate to defendant's diminished capacity claim.

8. *Supra* note 2.

9. This statement represents defendant's characterizations of the psychologist's findings.

told him about the robbery and murder, Dr. McMahon stated:

He was basically talking about being drunk at the time and not remembering much of anything.

When later pressed, however, Dr. McMahon acknowledged that defendant told him that he was being railroaded and that he did not commit the crimes. When the state pressed further by confirming that defendant told him that he did not commit the crimes, and not that he was drunk, Dr. McMahon responded by saying: "Well, he *may* have been drinking that evening." (Emphasis added.)

The only other evidence that mentions the possibility of defendant drinking before the murders was the testimony that Jones and defendant had gone to the Short Stop before the murders to get some wine and that the two of them went back to the store at midnight to get something to drink. Nothing in the record suggests that defendant was intoxicated when he and Jones went back to the Short Stop the second time, nor does the record reflect how much alcohol, if any, defendant consumed that day.

Moreover, even assuming that defendant was intoxicated at the time of the offense, his claim of diminished capacity under § 13–703(G)(1) still fails. To find a mitigating factor under this provision, defendant must prove that his capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was *significantly* impaired. A.R.S. § 13–703(G)(1) (emphasis added). Dr. McMahon did not conclude that defendant lacked the capacity to appreciate the wrongfulness of his conduct; rather, he stated only that defendant's alleged intoxication interfered with his ability to appreciate the full consequences of his behavior at the moment the offense occurred.

There is a dramatic difference between the ability to appreciate the wrongfulness of one's conduct and the ability to appreciate the full consequences of one's conduct. In fact, the evidence of defendant's wiping down the security guard's empty holster demonstrates that defendant knew enough to try to cover up his acts. This evidence bolsters the trial court's conclusion that defendant failed to prove that his capacity to appreciate the wrongfulness of his actions was significantly impaired. *Cf. State v. Gallegos,* 178 Ariz. 1, 17, 870 P.2d 1097, 1113 (1994).

Furthermore, defendant's argument that Dr. McMahon concluded that defendant "suffered from post-traumatic stress disorder to an extent sufficient to impair his ability to conform his conduct to the requirements of the law" is meritless. Defendant does not cite to anything in the record to support his claim.

Dr. McMahon's written report addresses only defendant's ability to appreciate the wrongfulness of his conduct. We searched the transcripts for evidence supporting defendant's claim, but the only testimony that remotely addresses this issue was general statements by Dr. McMahon about the tendency of persons suffering from post-traumatic stress disorder to act impulsively, and how the tendency to act impulsively increases when a person has been drinking. Essentially defendant presented evidence that individuals suffering from post-traumatic distress disorder are impulsive. Specifically, Dr. McMahon testified that such individuals have "*some* difficulties in inhibiting their impulses," and that "[t]hey basically are not particularly good at controlling their emotions." (Emphasis added.)

This court does not equate impulsiveness with the inability to conform one's conduct to the law. We conclude that a person's ability to conform his conduct to the requirements of law is not impaired simply because a person has a tendency to act impulsively. Many people who act impulsively still manage to act impulsively within the bounds of law.

Furthermore, much of the testimony regarding defendant's tendency to act impulsively hinged on the assumption that he had been intoxicated the evening of the offense. And, as we discussed above, defendant failed to prove that he had been drinking at all, let alone excessively, the evening of the offense. Other than this general statement concerning defendant's tendency to act impulsively, Dr. McMahon did not express an opinion on whether defendant's ability to conform his conduct to the requirements of the law was

significantly impaired. Moreover, we found no evidence in the record that would lead us to this conclusion. Accordingly, we affirm the trial court's conclusion that defendant failed to prove diminished capacity under § 13–703(G)(1).

## 2. *Potential for Rehabilitation and Minimal Risk for Future Dangerousness*

Defendant also argues that the trial court erred in refusing to consider in mitigation evidence that he possessed potential for rehabilitation and presented a minimal risk for future dangerousness. Essentially defendant argues that the court refused to consider this evidence because "the court asserted that potential for rehabilitation and lack of future dangerousness simply did not constitute mitigation at all." Not only do we disagree with defendant's characterization of the trial court's finding, but, after reviewing the evidence, we also find that defendant failed to prove either factor.

As we have repeatedly stated: "Defendant has the burden of proving the existence of mitigating circumstances by a preponderance of the evidence, and the court may take notice of evidence that tends to refute a proffered mitigating circumstance." *State v. Lavers*, 168 Ariz. 376, 394, 814 P.2d 333, 351 (1991) (citations omitted). In his sentencing memorandum, defendant asked the court to consider the fact that he did not pose a risk of future criminal conduct as a mitigating factor, stating:

**Risk of Future Criminal Conduct**

There is ample evidence that given the defendant's background, his behavior in jail, and his personality, the defendant does not pose a risk while incarcerated.

To support this claim, defendant offered Dr. McMahon's testimony that his condition could be treated and that he did not present a risk of future criminality.

In rejecting defendant's claim that he posed no risk of future criminal conduct, the trial court stated:

Doctor McMahon testified that he believed the defendant posed no risk as long as he was incarcerated. The court does not consider this to be a mitigating factor.

Defendant mischaracterizes this finding as an assertion on the part of the trial court that the "potential for rehabilitation and lack of future dangerousness simply did not constitute mitigation at all."

The trial court clearly understood its responsibility in considering all nonstatutory mitigating factors offered by defendant. The trial court specifically stated that it had also considered

nonstatutory mitigating circumstances, including any aspect of the defendant's character, propensities or record and any of the circumstances of the offense, A.R.S. § 13–703(G), to determine whether there are mitigating circumstances sufficiently substantial to call for leniency.

Based on our review of the record, we conclude that the trial court's statement meant only that the trial court determined that defendant did not prove the factor that he offered in mitigation. We agree with this conclusion.

Again, the only evidence that defendant offered to support his claim that he was no longer dangerous was Dr. McMahon's testimony that he did not present a risk of future criminality. We find it a stretch to read this testimony as saying that defendant was no longer dangerous. Moreover, Dr. McMahon's written report and his testimony lead us to the opposite conclusion.

In his report, when discussing the two primary ways that people respond to significant trauma, Dr. McMahon stated:

One group suffers from periodic episodes of debilitating trauma, panic, and depression—avoiding any situation that retriggers the terrified, traumatic state they initially went through.

The second group, rather comes to see the world as a jungle, where the strong eat the weak, and they, not wanting to be eaten [abused], decide that the best defense is a good offense. They then set out to become more hardened, more insensitive to the needs of others, so that they are able to intimidate others rather than *ever* risk being intimidated or abused themselves. It would appear that [defendant] has developed along this second path.

(Emphasis supplied.) Dr. McMahon's testimony during the sentencing hearing reinforced our view that defendant is and will continue to be a dangerous individual. Dr. McMahon testified that he believed that defendant would continue to take from others, to be the strong versus the weak, whenever he felt threatened. And, even more importantly, he stated that defendant could perceive a threat that would not objectively be seen as a threat. Based on the evidence presented, we find no error in the trial court's failure to find that defendant presents minimal risk of future dangerousness.

■ We reach a similar conclusion with defendant's claim that he has the potential for rehabilitation. Dr. McMahon testified that, at one time, the prevalent view was that people in defendant's position were not treatable, but that the current view is that defendant's condition is treatable. He also acknowledged that some people would disagree with this conclusion. This testimony was the only evidence presented supporting defendant's potential for rehabilitation.

Substantial evidence, however, tended to refute Dr. McMahon's conclusion. For instance, even after having been convicted, defendant continued to deny that he committed the murders. Moreover, Dr. McMahon stated that defendant strongly disagreed with his findings and stated that defendant did not think that he or his family had any problems and that he did not want "to drag any treatment through the courts." Defendant's denial both of committing the murder and of having any problems is consistent with his failure to seek the treatment that Dr. McMahon admitted was available to defendant for some of the 7 years that defendant was in prison.

Merely because a condition can be treated does not lead us to conclude that a particular person has the potential for rehabilitation. Defendant's past failure to seek treatment and current denials refute his claims that he has the potential for rehabilitation. Accordingly, we find no error with the trial court's failure to make such a finding.

## 3. Witness Elimination

■ Defendant also challenges the trial court's finding that the murders were committed in an especially depraved manner. The trial court found that defendant murdered the two victims to prevent them from testifying against him. Based *solely* on this finding, the court concluded that the state had proved that defendant committed the murders in an "especially depraved manner" under A.R.S. § 13–703(F)(6). Citing the concurrence in *State v. Greenway,* 170 Ariz. 155, 174, 823 P.2d 22, 41 (1991) (Feldman, C.J., concurring), defendant argues that the trial court erred in finding this aggravating factor because Arizona case law does not support such a finding. The state rebuts defendant's claim by arguing that murdering someone to eliminate that person as a witness falls within the definition of heinousness and depravity as set forth in *State v. Gretzler,* 135 Ariz. 42, 659 P.2d 1 (1983), because it is a form of gratuitous violence.

In *Greenway,* the trial court found that the murders were committed in a heinous and depraved manner under § 13–703(F)(6), based on its findings that (1) the victims were helpless, (2) defendant relished the murders, and (3) the murders were motivated by defendant's desire to eliminate witnesses. 170 Ariz. at 166–67, 823 P.2d at 33–34. Chief Justice Feldman specially concurred, emphasizing that although "killing to eliminate witnesses may be a *factor* in finding depravity," the court has never held that a finding of heinousness and depravity could be based solely on a finding that a murder was motivated by a desire to eliminate a witness. *Greenway,* 170 Ariz. at 174, 823 P.2d at 41 (noting that *State v. Correll,* 148 Ariz. 468, 715 P.2d 721 (1986), *State v. Gillies,* 142 Ariz. 564, 691 P.2d 655 (1984), and *State v. Roger Smith,* 141 Ariz. 510, 687 P.2d 1265 (1984), did not hold that killing merely to eliminate a witness was an aggravating circumstance). We agree with Chief Justice Feldman's interpretation of our case law.

This court first discussed the aggravating value of evidence that a defendant killed solely to eliminate the victim as a witness in *Smith,* 141 Ariz. at 511–12, 687 P.2d at 1266–67. In *Smith,* the trial court found that the

murder of an unresisting store clerk during a robbery was committed in an especially depraved manner under § 13–703(F)(6). The court's finding was based solely on its determination that the victim's murder was senseless because Smith could have robbed the victim and escaped without harming him. *Smith,* 141 Ariz. at 511, 687 P.2d at 1266.

Although disagreeing with the trial court's reasoning in dicta, this court went on to discuss facts in the record that would have supported a finding of depravity had the state proved them beyond a reasonable doubt. *See Smith,* 141 Ariz. at 511–12, 687 P.2d at 1266–67. In particular, this court stated that Smith's laughing and joking about the murder and stating that he murdered the clerk so the clerk would not be able to testify against him would tend to indicate an especially depraved state of mind. *Smith,* 141 Ariz. at 511–12, 687 P.2d at 1266–67. This court did not consider such facts, however, because the trial court did not include them in its special verdict. Thus, both defendant's conviction and his sentence were affirmed without a finding of depravity as an aggravating factor.

The first case in which the court actually used a defendant's motive to eliminate a witness to support a trial court's finding that a murder was committed in a heinous or depraved manner was *Gillies,* 142 Ariz. 564, 691 P.2d 655. In *Gillies,* "[t]he trial court found two factors indicative of heinousness and depravity: 1) the senselessness of the murder, and 2) the savage manner of death." *Gillies,* 142 Ariz. at 570, 691 P.2d at 661. We agreed with both of the trial court's findings. *Gillies,* 142 Ariz. at 570, 691 P.2d at 661. We went on to reject Gillies' argument that the trial court erred in finding that the murders were senseless because he had a reason for committing the murder: to avoid prosecution. Comparing *Gillies* to the court's decision in *Smith,* we stated: "We believe elimination of witnesses, as a motive for murder, *also* illustrates heinousness and depravity." *Gillies,* 142 Ariz. at 570, 691 P.2d at 661 (emphasis added).

Similarly in *Correll,* the trial court found that the murders were motivated by Correll's desire to eliminate witnesses to his crime. 148 Ariz. at 481, 715 P.2d at 734. The trial court considered this, along with other facts, in concluding that Correll committed the murders in a depraved manner under § 13–703(F)(6). 148 Ariz. at 481, 715 P.2d at 734 (also finding that murders were senseless and that victims, bound and gagged before being shot, were helpless).

Neither *Smith, Gillies,* nor *Correll* can be read as holding that a murder is heinous or depraved under § 13–703(F) based *solely* on a finding that the murder was motivated by the desire to eliminate a witness.

The only case in which the court accepted a finding of depravity based solely on a finding that the murder was motivated by a desire to eliminate witnesses was *State v. Marlow,* 163 Ariz. 65, 71, 786 P.2d 395, 401 (1989). In support of its finding, the court in *Marlow* erroneously cited *Correll, Gillies,* and *Smith,* with no further discussion of the cases. We attribute the lack of discussion concerning this aggravating factor to the court's ultimate resolution of the case. In *Marlow,* the court struck two of the three aggravating factors found by the trial court. The court also concluded that the trial court had failed to consider substantial mitigating evidence present in the case. Based on these errors, and without any need to discuss the propriety of the remaining aggravating factor, the court reduced Marlow's sentence to life imprisonment.

We are now faced with the question whether § 13–703(F)(6) permits this court to find that a killing is especially heinous or depraved based solely on a finding that the motive for the killing was to eliminate witnesses. We conclude that it does not.

The court intuitively recognizes the potential deterrent value of making killings motivated by a desire to eliminate witnesses a *per se* aggravating circumstance. We note, however, that unlike other states that characterize a convicted murderer's motive to eliminate witnesses as a *per se* aggravating factor,[10] our "legislature has characterized only

---

10. *See, e.g.,* Cal.Penal Code § 190.2(a)(10) (West Supp.1994); N.M.Stat.Ann. § 31–20A–5(G) (Mi-

chie Supp.1994); Utah Code Ann. § 76–5–

one motive—pecuniary gain—as a *per se* aggravating circumstance." *Greenway,* 170 Ariz. at 174, 823 P.2d at 41. We are forced to conclude, therefore, that "[b]y failing to enumerate any other motive, the legislature has implied that other reasons for killing are not *per se* aggravating circumstances." *Greenway,* 170 Ariz. at 174, 823 P.2d at 41. Thus, we must analyze whether we are constitutionally permitted to find that a killing motivated by a desire to eliminate a witness, standing alone, supports a finding that a murder was committed in an especially heinous or depraved manner under § 13–703(F)(6).

The United States Supreme Court repeatedly has held that this court's interpretation of the term "especially heinous, cruel, or depraved" meets constitutional requirements. *See Lewis v. Jeffers,* 497 U.S. 764, 777–78, 110 S.Ct. 3092, 3100–01, 111 L.Ed.2d 606 (1990), affirming our interpretation of the (F)(6) factor in *State v. Jeffers,* 135 Ariz. 404, 429–30, 661 P.2d 1105, 1130–31 (1983), which relied on the 5 factors set forth in *State v. Gretzler,* 135 Ariz. 42, 659 P.2d 1 (1983), *and* the definition of heinous and depraved set forth in *State v. Knapp,* 114 Ariz. 531, 562 P.2d 704 (1977); *see also Richmond v. Lewis,* — U.S. —, —, 113 S.Ct. 528, 535, 121 L.Ed.2d 411 (1992), noting that *Gretzler* "*provided an adequate narrowing construction* of [Arizona's (F)(6) factor]." (Emphasis added.) Because our decision in *Gretzler* is critical to the constitutional application of the "cruel, heinous or depraved" aggravating circumstance, we begin our analysis with a discussion of *Gretzler.*

In *Gretzler,* we noted that this court has always recognized that "the words 'especially heinous, cruel, or depraved' were not intended to apply to all first degree murders." 135 Ariz. at 50–51, 659 P.2d at 9–10. We specifically stated that these terms "apply to 'a killing wherein additional circumstances of the nature enumerated ... *set the crime apart from the usual or the norm.'*" *Gretzler,* 135 Ariz. at 51, 659 P.2d at 10 (citations omitted) (emphasis added).

In explaining the concept of "heinous and depraved," we stated:

[T]he statutory concepts of heinous and depraved involve a killer's vile state of mind at the time of the murder, as evidenced by the killer's actions.

135 Ariz. at 51, 659 P.2d at 10. We went on to discuss 5 factors, the existence of which can lead to a finding of heinousness or depravity: (1) the apparent relishing of the murder by the killer, (2) the infliction of gratuitous violence on the victim, (3) the needless mutilation of the victim, (4) the senselessness of the crime, and (5) the helplessness of the victim. *Gretzler,* 135 Ariz. at 51–52, 659 P.2d at 10–11. The court specifically noted that the senselessness of the crime and the helplessness of the victim, together or separately, *when considered with other circumstances* present in a particular case, *may* lead to the conclusion that an offense was heinous or depraved. *Gretzler,* 135 Ariz. at 52, 659 P.2d at 11 (emphasis added).

Although killing someone to eliminate that person as a potential witness does not fall squarely within any of the 5 *Gretzler* factors, this court has recognized the evidentiary value of this factor when refuting a defendant's arguments that a murder was not senseless because it was committed to avoid prosecution. *See Gillies,* 142 Ariz. at 570, 691 P.2d at 661. As we have repeatedly stated: "[E]nding the life of a human being so that that person cannot testify against the defendant indicates a complete lack of understanding of the value of a human life." *Correll,* 148 Ariz. at 481, 715 P.2d at 734, citing *Smith,* 141 Ariz. at 512, 687 P.2d at 1267. Further, we agree that killing to eliminate a witness may be a factor in finding depravity because it demonstrates a cold-blooded, vile state of mind. *See Knapp,* 114 Ariz. at 543, 562 P.2d at 716 (defining heinous as "hatefully or shockingly evil: grossly bad," and defining depraved as "marked by debasement, corruption, perversion or deterioration"). We cannot, however, conclude that this fact alone supports a finding that the murder was committed in a heinous or depraved manner.

A finding that a murder was motivated by a desire to eliminate a witness is similar to a

202(1)(i) (Michie Supp.1994); Wash.Rev.Code Ann. § 10.95.020(7) (West 1990).

finding that the crime was senseless or the victim was helpless under *Gretzler*. And, only under limited circumstances will the senselessness of a murder or the helplessness of the victim—together or standing alone—lead to a finding that a murder was committed in a heinous or depraved manner. *See Gretzler*, 135 Ariz. at 52–53, 659 P.2d at 11–12, discussing *State v. Lujan*, 124 Ariz. 365, 373, 604 P.2d 629, 637 (1979) (unconscious victim was helpless but murder not heinous or depraved), and *State v. Blazak*, 131 Ariz. 598, 604, 643 P.2d 694, 700 (1982) (unnecessary killing of robbery victim and bystander not heinous or depraved).

■ To find that a murder was committed in a cruel, heinous or depraved manner, enough evidence must be presented such that when it is considered, the court can conclude that the circumstances of the murder raise it above the norm of first degree murders. *Blazak*, 131 Ariz. at 604, 643 P.2d at 700; *cf. Gillies*, 142 Ariz. at 569–70, 691 P.2d at 660–61 (murder committed in savage manner and to eliminate witnesses). We concede that the two murders committed by defendant were the acts of a cold-blooded, vile mind. But such cold-bloodedness, without more, does not elevate this murder above the norm. *See State v. Bernard Smith*, 146 Ariz. 491, 504, 707 P.2d 289, 302 (1985) (murder not heinous or depraved when defendant shot unresisting store clerk during robbery); *Blazak*, 131 Ariz. at 604, 643 P.2d at 700 (same finding when defendant shot robbery victim and 2 innocent bystanders). We therefore reject the trial court's finding that the murders were committed in an especially heinous or depraved manner under § 13–703(F)(6).

## IV. INDEPENDENT REVIEW

■ In death penalty cases, this court independently reviews aggravating and mitigating circumstances to determine whether the death penalty was properly imposed. *State v. Milke*, 177 Ariz. 118, 128, 865 P.2d 779, 789 (1993). Accordingly, we have reviewed and considered all of the aggravating and mitigating evidence presented.

### 1. *Aggravating Factors*

■ The trial court found that the state proved, beyond a reasonable doubt, the following aggravating factors set forth in A.R.S. § 13–703:

1. (F)(5)—The defendant committed [these murders] as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value.
2. (F)(6)—The defendant committed the offense in an especially ... depraved manner.
3. (F)(8)—The defendant has been convicted of one or more other homicides, as defined in § 13–1101, which were committed during the commission of the offense.

Except for the trial court's finding that defendant committed the murders in an especially depraved manner, as discussed above, we agree with the trial court that the state proved, beyond a reasonable doubt, the existence of the (F)(5) and the (F)(8) aggravating factors. Although the trial court stated in its special verdict that the (F)(8) factor "supports the imposition of a death sentence on either count one or count two," once proved, this aggravating factor applies to *each* first-degree murder conviction. *State v. Ramirez*, 178 Ariz. 116, 131, 871 P.2d 237, 252 (1994).

In this case, we have concluded that the trial court correctly found two statutory aggravating circumstances—that defendant committed the murders for pecuniary gain and that he committed multiple murders during the commission of the offense. Thus, under A.R.S. § 13–703(E), defendant is to receive the death penalty unless mitigating circumstances are sufficiently substantial to call for leniency.

### 2. *Mitigating Factors*

Although the trial court found no statutory mitigating circumstances, it concluded that defendant proved, by a preponderance of the evidence, the following non-statutory mitigating circumstances: (1) defendant had a traumatic childhood, (2) he came from a dysfunctional family, (3) he had a substance abuse problem, (4) he suffers from post-traumatic

stress disorder,[11] (5) he has an antisocial personality disorder produced in part by his dysfunctional childhood,[12] and (6) he has a family that loves him. We have considered all of the mitigating evidence presented, and we agree with the trial court's findings that these non-statutory mitigating circumstances exist. More importantly, we also agree with the trial court's rejection of defendant's claims that (1) he was substantially impaired under A.R.S. § 13–703(G)(1), (2) his age at the time of the murders, 26, was a mitigating factor under A.R.S. § 13–703(G)(5), (3) he was remorseful, and (4) he presented little risk of future criminal conduct as evidenced by his potential for rehabilitation and the minimal risk for future dangerousness that he presented.[13]

### 3. *Reweighing*

■ We have concluded that the trial court erred in finding, as an aggravating factor, that defendant committed the murders in an especially depraved manner. We must now determine whether to reweigh or remand for new sentencing. In *State v. Bible,* this court discussed procedures to be employed when this court sets aside one, but not all, of the statutory aggravating factors. *See State v. Bible,* 175 Ariz. 549, 608–09, 858 P.2d 1152, 1211–12 (1993). In *Bible,* we carved out a narrow class of cases this court appropriately reweighs rather than remands. *See State v. Milke,* 177 Ariz. at 128, 865 P.2d at 789. This case falls within that narrow class because no new evidence is to be received, no mitigating evidence was improperly excluded at sentencing, and the mitigating evidence is, at best, *de minimis.*[14] Moreover, although one statutory aggravating cir-

cumstance was set aside, nothing in the evidence concerning that circumstance constitutes mitigation.

■ Five of the 6 non-statutory mitigating circumstances—traumatic childhood, dysfunctional family, substance abuse, post-traumatic stress disorder, and antisocial personality—are interrelated. As noted by the trial court, these circumstances produced a person, described by Dr. McMahon, as someone who sees

> the world as a jungle, where the strong eat the weak, and ... not wanting to be eaten [abused], decide that the best defense is a good offense. They then set out to become more hardened, more insensitive to the needs of others, so that they are able to intimidate others rather than *ever* risk being intimidated or abused themselves.

(Emphasis supplied.) Whatever forces served to produce defendant, as an adult, he has done little if anything to overcome his past. According to Dr. McMahon, defendant believes that he has no problems. His belief is borne out by his failure to seek treatment during most of his 7 years in prison, which Dr. McMahon testified was available. Thus, having previously rejected defendant's argument that his ability to conform his conduct to the requirements of law or to appreciate the wrongfulness of his conduct was substantially impaired as a result of all these circumstances, we find that these circumstances carry very little mitigating weight.

Equally of minimal mitigating value is the court's finding that his family loves him. At age 25, after having served almost 7 years in prison and a mere 4 months after being released from prison,[15] defendant robbed a

11. Although the trial court referred to defendant as suffering from "post-traumatic distress," the terminology that Dr. McMahon used in his report is post-traumatic stress disorder.

12. *Supra* note 2.

13. Defendant does not challenge on appeal the court's finding that he failed to prove that his age was a mitigating factor or that he failed to prove remorse. His challenges to the court's finding that he failed to prove both that he was substantially impaired and presented little risk for future criminal conduct are addressed in the preceding section.

14. We are aware that the legislature recently enacted A.R.S. § 13–703.01, which deals with appellate procedures in death penalty cases. This case was briefed and argued before the statute was enacted. And, because we concluded that the court could properly reweigh under our precedent in *Bible,* we decide no issues relative to the statute's applicability or constitutionality.

15. Defendant's discharge from the Department of Corrections was effective August 28, 1989. Defendant committed the murders around midnight on December 27, 1989.

convenience store and murdered two people. We must consider that his family's love has not stopped him from what amounts to a lifetime of crime for defendant. *Cf. State v. Carriger,* 143 Ariz. 142, 162, 692 P.2d 991, 1011 (1984).

Given the presence of the two remaining separate statutory aggravating circumstances and the *de minimis* nature of the mitigation, it is inconceivable that removing the "especially depraved manner" finding, which was based solely on the court's finding that defendant murdered the victims to eliminate witnesses, would lead to any different result in the trial court. *Cf. Milke,* 177 Ariz. at 128, 865 P.2d at 789. Our review satisfies us that the mitigation presented in this case is wholly insufficient to reduce defendant's sentence to a life sentence, given the absence of the "depravity" factor. There is "simply nothing to weigh or balance." *Bible,* 175 Ariz. at 609, 858 P.2d at 1212. We are therefore able to affirm the imposition of the death sentence, even though one of the three aggravating circumstances found by the trial court is inapplicable. *Cf. Milke,* 177 Ariz. at 129, 865 P.2d at 790.

## V. DISPOSITION

We have searched the record for fundamental error pursuant to A.R.S. § 13–4035 and have found none. We affirm defendant's convictions. Although we vacate the trial court's finding that the murders were committed in an especially depraved manner, we nevertheless affirm the death penalty on each of defendant's murder convictions.

FELDMAN, C.J., and ZLAKET, J., concur.

MOELLER, Vice Chief Justice, specially concurring.

I agree with the majority opinion except for that portion of it which sets aside the statutory aggravating factor of "especially heinous, cruel or depraved," A.R.S. § 13–703(F)(6). The majority concludes that the trial court's finding that the killings were for the purpose of eliminating witnesses does not, by itself, support an (F)(6) finding. My disagreement is twofold. First, I do not believe that the majority's approach properly places the issue before this court. Second, even if the majority had properly reached the issue, I am not convinced that it is either proper or wise to hold that witness elimination as a motive for killing can never alone support an (F)(6) finding.

Such a holding is unnecessary to the resolution of this case, since the majority concludes, as do I, that defendant's sentences should be affirmed without regard to the validity of the (F)(6) finding. My initial concern is one of methodology. We have repeatedly stated the rule to be that we independently reweigh statutory aggravating circumstances in death penalty cases. *E.g.,* slip op. at 45. Given this rule, we should not, in my opinion, set aside an (F)(6) finding (or any other statutory aggravating circumstance) unless and until we have ourselves independently reweighed the evidence on the point and found it lacking. If the reweighing is truly an independent reweighing, as we have repeatedly asserted, this court can consider all the relevant evidence properly in the record and is not limited to the precise item or items that persuaded the trial court. *See State v. Lopez,* 175 Ariz. 407, 411–12, 857 P.2d 1261, 1265–66 (1993); *State v. Kiles,* 175 Ariz. 358, 372, 857 P.2d 1212, 1226 (1993); *State v. Styers,* 177 Ariz. 104, 115, 865 P.2d 765, 776 (1993); *State v. Stanley,* 167 Ariz. 519, 528–29, 809 P.2d 944, 953–54 (1991). Thus, until we have examined the entire record and concluded that witness elimination is in fact the only evidence of heinousness or depravity, the issue of whether witness elimination by itself can support an (F)(6) finding is not properly before this court. Because this court has not engaged in any such review in this case, the (F)(6) finding should not be set aside.

Even if the majority opinion had properly reached the issue, I disagree with its conclusion that, as a matter of law, witness elimination alone can never support an (F)(6) finding. First, contrary to the majority's assertion, this court has previously upheld a finding of depravity based solely on a finding of witness elimination. In *State v. Marlow,* 163 Ariz. 65, 71, 786 P.2d 395, 401 (1989), we held that the record supported the trial court's finding that "the murder was committed in

an especially heinous or depraved manner because the motive for the killing was to eliminate the victim as a witness." *Id.*

The majority opinion minimizes *Marlow* on the theory that *Marlow* "erroneously cited" three prior cases of this court. Op. at 1037 n. 8 (discussing *Marlow*, 163 Ariz. at 71, 786 P.2d at 401 (citing *State v. Correll*, 148 Ariz. 468, 715 P.2d 721 (1986); *State v. Gillies*, 142 Ariz. 564, 691 P.2d 655 (1984); *State v. Smith*, 141 Ariz. 510, 687 P.2d 1265 (1984))). I do not believe we can so easily disregard *Marlow*. The majority is correct to the extent that none of the cases cited in *Marlow* holds that a finding of witness elimination *alone* supports an (F)(6) finding. My review of these cases, however, reveals that each holds that witness elimination as a motive for killing illustrates or tends to show heinousness or depravity. *Correll*, 148 Ariz. at 481, 715 P.2d at 734; *Gillies*, 142 Ariz. at 570, 691 P.2d at 661; *Smith*, 141 Ariz. at 511–12, 687 P.2d at 1266–67.

Relying on these cases, the court in *Marlow* did decide that under the circumstances of that case, witness elimination alone was in fact enough to support an (F)(6) finding. I do not see how the *Marlow* court erred in citing, in support of that holding, cases where witness elimination was an important consideration in upholding a similar finding. *Marlow* is a relatively recent decision of this court that is directly on point, and it is a mistake to disregard it.

Finally, quite aside from the problem of not following our own precedent, it is an unwise construction of our death penalty statute to say that, as a matter of law, witness elimination alone can never support an (F)(6) finding. If the majority believes that the circumstances of this particular case do not support an (F)(6) finding, it should so hold and leave the larger question open for future cases. I am not willing to foreclose the possibility that some day a case will present circumstances where witness elimination alone may very well support a finding of heinousness or depravity. An example of such a case might be the murder of a government witness arranged by gangs or organized crime under circumstances not falling within the aggravating pecuniary value provisions of § 13–703(F)(4) or (5).

For these reasons, I concur in the result, but dissociate myself from the majority's discussion concerning the trial court's (F)(6) finding. It is both unnecessary and unwise to hold that witness elimination alone can never satisfy § 13–703(F)(6).

MARTONE, J., concurs.